ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

### Nos. 23-3198, 23-3199

---

### UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

### CYNTHIA BALLENGER & CHRISTOPHER PRICE
*Defendants-Appellants.*

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

### APPELLANTS' CONSOLIDATED BRIEF

---

Nandan Kenkeremath
2707 Fairview Court
Alexandria, Virginia 22311
(703) 407-9407
nandank@comcast.net
*Counsel for Defendants-
Appellants*

District Court Cr. Nos.
1:21-719-JEB-1
1:21-719-JEB-2

i

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici:**

This appeal arises from a criminal conviction of defendants-appellants Cynthia Ballenger (Price) and Christopher Price (by plaintiff-appellee, the United States of America.  There are no intervenors or amici.

**B.  Rulings Under Review:**

This is an appeal from judgments of conviction (A698 and A707) entered October 3, 2023) against Cynthia Ballenger (Price) and Christopher Price (together the Prices). The District Court extended the date for filing any appeal in the instant cases until November 9, 2023 by minute order dated October 11, 2023.  Notices of Appeal were timely filed on October 26, 2023.

The convictions are for violations under 18 U.S.C.§§1752(a)(1) and (2) (Counts 1 & 2) and 40 U.S.C. §§5104(e)(2)(D) and (G) (Counts 3 & 4) for entering or remaining in a "restricted building or grounds" in violation of 18 U.S.C. § 1752(a)(1), after a bench trial before the Honorable Chief Judge James E. Boasberg.

i

**Related Cases:**

These cases have not been before this Court previously. There are no other related cases of which Defendants-Appellants are aware.

## STATEMENT REGARDING ORAL ARGUMENT

An oral argument is not yet scheduled.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES …………………………………………

STATEMENT REGARDING ORAL ARGUMENT……………………

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iii

JURISDICTIONAL STATEMENT .................................................. 1

STATUTES INVOLVED ................................................................. 1

STATEMENT OF ISSUES.............................................................. 1

STATEMENT OF THE CASE ........................................................ 3

I.    The Course of Proceedings and Disposition in the Court Below ................................................................. 3

II.   Statement of Facts ................................................................. 5

A. The Suspension and Resumption of the
   Certification Proceedings ...................................... 5

B. The Movement and Conduct of the Prices .......................... 5

C. Certain Police Steps in the Small Foyer
   After the Prices Left .............................................. 20

SUMMARY OF ARGUMENT ........................................ 22

ARGUMENT .................................................................. 27

I.    Certain Rules of Statutory Constructions And
      Constitutional Principles Favor the Prices
      in the Instant Case ............................................... 27

   A. Congress Defines A Federal Crime, Not the Courts ........... 27

   B. Congress Must Provide the Ascertainable
      Standard of Guilt ................................................ 27

   C. Courts Must Show Restraint Unless a Broad
      Scope of Criminal Conduct Is Clear or Plain
      From the Statute ................................................ 28

II.   The District Court Interpretation of Restricted Area
      Under 18 U.S.C. § 1752(c) Is in Error and Evidence
      Was Insufficient to Find the Prices Walked In
      A Restricted Area ................................................ 30

   A. Standard of Review .............................................. 30

   B. The Ghost of A Former Restricted Area,
      Even if Previously Established, Does Not Satisfy
      18 .S.C. § 1752(c) ................................................ 30

C. A Protectee Was Not on and Was Not Expected
   to Be on the West Grounds or the Upper Terrace North East,
   Upper North Terrace, Upper Terrace Northwest Or
   Upper Terrace West as Required for Restricted Grounds
   Under 18 U.S.C.§ 1752(c) ..................................................... 32

D. The Location and Operation of the Actual
   Police Cordons Inside the Senate Wing Door
   When the Prices Approached the Door and Entered
   Defines the Location of Any Potentially Restricted Areas
   Under 18 U.S.C.§ 1752(c) At That Time and Location........ 33

E. The District Court Misreads the Term
   "Otherwise Restricted Area" .................................................. 36

   1. The Loud Boom Before The West Café Did Not
      Demarcate A Restricted Area .......................................... 37

   2. Fire Engines with Lights and, Separately,
      Intermittent Police Sirens on Constitution Avenue
      Did Not Demarcate A Restricted Area ............................ 38

   3. The 1-Foot Curb Not Separating Restricted Areas
      From Non-Restricted Areas Does Not Demarcate
      a Restricted Area ............................................................ 39

   4. The Fleeting Part of a Second On A Video
      Showing A Lone, Bike Rack Which Is Not A Barrier
      To Pedestrian Traffic Does Not Demarcate
      A Restricted Area............................................................ 39

   5. The Prices Did Not Encounter Tear Gas On
      the Upper Northwest Terrace Or West Terrace
      Before At The Time Of Being In Those Areas ................ 42

III.  The District Court's Interpretation of Disruptive
      Conduct Under 18 U.S.C. § 1752(a)(2) And
      40 U.S.C. § 5104(e)(2)(D), as Included in The
      Superseding Information for Counts 2-3, Is in Error
      and Evidence Was Insufficient to Convict the Prices
      Under Those Provisions ........................................................ 45

A. Standard of Review ................................................................... 45

B. The District Court Properly Did Not Find That The
   Prices Engaged In "Disorderly Conduct" And Properly
   Found at Trial That Individual Conduct of The Prices
   Would Not Be "Disruptive Conduct" ........................................ 45

C. "Disruptive Conduct" Must Be More Than
   "Entering or Remaining" Based on the Context of
   the Other Provisions in 18 U.S.C. § 1752(a) And
   40 U.S.C. § 5104(e) ................................................................. 45

D. For the *Actus Reus* Under §1752(a)(2) And § 5104(e)(2)(D)
   the Adjective "Disruptive" Applies to the "Conduct"
   and Not to Surrounding Circumstance or the
   Conduct of Others or the Impact .............................................. 48

E. Appellants Found Only One Conviction
   Under § 1752(a)(2) or § 5104(e)(2)(D) Prior Which
   Provides No Case Law Basis Prior To January 6th
   Cases for The District Court's Novel Constructions ............... 49

F. There Is Insufficient Evidence to Convict The
   Prices Under Traditional Rules of Statutory
   Construction and Case Law Prior To January 6th Cases ......... 50

   1. Peacefully Standing in Line to Exit is Not Disruptive
      Conduct or Any Crime .......................................................... 50

   2. Entering the Small Foyer and Walking South For
      1 Minute, Even If A Violation of 1752(a)(1), is Not

Disruptive Conduct ........................................................... 51

3. Being or Remaining on the Upper Terrace Is Not
Disruptive Conduct ........................................................... 52

G. The Lower Court's Key Findings and Illegal Ruling
Is That Otherwise Non-Disruptive Conduct Satisfies
the *Actus Reus* Under Counts 2-3 By Stating the
Prices "Joined" A "Mob" ........................................................... 52

H. The Prices Are Charged as Individuals and Not with Alleged
Relationship to the Conduct of Others .................................... 54

I. The Government and District Court Inclusion of First
Amendment Assembly Conduct Before Going to the
Capitol Grounds to Convict as a "Joining" Are
Assault on First Amendment Assembly ................................... 57

J. There was No Evidence of a Dispersal Order Where
Fair Notice by Announcement and Reasonable
Opportunity to Comply Is Required ................................... 58

K. Certain Interpretations from the Alford Appellate
Opinion Do Not Properly Apply or Do Not Properly
Apply in the Instant Case ........................................................... 60

L. In Its Rule 29 Opinion the District Court Added Further
Inappropriate or Insufficient Argument Regarding Alleged
Disruptive Conduct ........................................................... 64

IV.   The District Court's Interpretation of the Requirement
that "Such Conduct, In Fact, Impeded or Disrupted"
Under 18 U.S.C. § 1752(a)(2) Is in Error and the
Evidence Was Also Insufficient to Convict
Under Count 2 ........................................................... 67

A. Standard of Review ........................................................... 67

B. Such Conduct Is Individual Disorderly or Disruptive
   Conduct of the Prices ................................................... 67

C. The Prices Could Not Impede or Disrupt the "Conduct"
   of Business That Was Already Suspended ............................... 68

D. The District Courts Legal Interpretation That
   Mere Presence Much Earlier in the Day Is, Per Se,
   a Sufficient Tie-in Regarding Delay to Proceeding
   Occurring Many Hours Later ........................................... 68

E. The District Court Analysis of *Burrage* Is Error ..................... 71

V.   The District Court's Legal Interpretation of the
     *Actus Reus* For 40 U.S.C. § 5104(e)(2)(G) Is in Error
     and There is Insufficient Evidence to Convict
     Under Count 4 ....................................................... 74

A. Standard of Review .................................................... 74

B. The District Court Improperly Adopted the
   "Joined the Mob" Theory for Count 4 .................................. 74

C. The District Court Fails to Acknowledge
   First Amendment Rights Outside the Capitol,
   the Statutory   Limitation to Conduct Inside the Capitol,
   And the Limitation to Consider Evidence from the Trial........76

D. The Prices Engaged in No Demonstrative Conduct,
   No Disruptive Conduct, and No Conduct Was
   "Organized" .......................................................... 77

VI.  There is Insufficient Evidence to Meet the
     *Mens Rea* Test for Counts 1, 2, 3 & 4..............................79

     A. Standard of Review…………………………………………………79

B. There is Insufficient Evidence for the

  Mens Rea Test for Count 1, 2, 3, & 4...........................79

VII. 18 U.S.C. § 5104(e)(2)(G) is Facially Unconstitutional ....... 82

A. Standard of Review .................................................................. 82

B. 40 U.S.C. § 5104(e)(2)(G) Involve First and
   Fifth Amendment Concerns ...................................................... 83

C. Parts of the Capitol Building Should Be Public
   Forum and Parts Non-Public Forum ....................................... 84

D. 40 U.S.C. § 5104(e)(2)(G) Is Unreasonable Under the
   Non-Public Forum Analysis and Not Narrowly Tailored
   Under the Public Form Analysis; The Provision Needlessly
   Punishes First Amendment Conduct Solely
   Because It Is First Amendment Conduct .................................. 85

E. Certain District Courts Have Improperly
   Included Fundamental Additional Areas of
   First Amendment Speech .......................................................... 87

VIII. The Prices' Convictions on Counts 1-4 Should Be
    Vacated Because the Superseding Information for Each
    Defendant-Appellant Failed to Allege Essential
    Facts and The Nature of the Accusation .............................. 88

  A. Standard of Review ............................................................... 88

  B. The Bare Recitation of Certain Statutory Language,
     the Date and General Location Fails the
     Legal Standards in for A Superseding Information
     In the Instant Case ............................................................. 89

IX.   The Prices' Convictions on Counts 1-4 Should Be
      Vacated Since Evidence Garnered or Derived from
      The Illegal Search Warrant and
      Search Warrant Operation for Facebook
      Was Important to Conviction and To Ensure
      Future Conduct Does Not Fail
      Fourth Amendment Protections ........................................... 92

A. Standard of Review........................................................92

B. The Search Warrant and Search Warrant Process
   Was A Sham and Unreasonable Under
   the Fourth Amendment ................................................. 92

C. Failure to Follow the Scope Limitations in the
   Authorizing Statute and Limitations Is Both
   Constitutionally Unreasonable a Relevant
   Part of an Unreasonableness Analysis
   under the Fourth Amendment.......................................95

D. The *Leon* Good Faith Exception Does Not Apply...................96

E. The Prosecution Added to the Problem During
   And After Trial.............................................................99

X.    The District Court Failed to Make Necessary Findings
      in the Process of Sentencing ................................. 100

A. Standard of Review........................................................100

B. The Court Did Not Make the Proper and Necessary
   Findings for the Guideline Ranges in the
   Presentencing Report................................................ …100

1. The Base Offense Level Should Be 6 Points and
   Based on USSG §2B2.3 And Not USSG §2A2.4.......................102

2. The District Court Did Not Make the Requisite
Findings for a 2-level enhancement under USSG § 3C1.1
For Cynthia Ballenger ............................................................. 104

C. The District Court Failed to Comply with The
Requirement to Rule on Disputed Portions of the
Presentence Report ................................................................... 106


CONCLUSION................................................................... 106

CERTIFICATE OF LENGTH ....................................... 108

CERTIFICATE OF SERVICE........................................ 108

ADDENDUM…………………………………………………..110

## TABLE OF AUTHORITIES

### CASES

*Bittner v United States* 143 S. Ct. 713 (2023) ............................... 29

*Bouie v. Columbia*, 378 U.S. 347 (1964) ....................................... 29

*Burrage v. United States*, 571 U.S. 204 (2014)............................. 69

*Bynum v. U.S. Capitol Police Bd.*,
    93 F. Supp. 2d 50 (D.D.C. 2000) ......................................... 77

*Callahan* v. *Cardinal Glennon Hospital*,
    863 S.W. 2d 852 (Mo. 1993) ................................................. 73

*Commissioner v. Acker*, 361 U. S. 87 (1959).................................. 29

*Cornelius v. NAACP Legal Defense Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ............................................................... 84

*Dowling v. United States*, 473 U.S. 207 (1985) ............................. 28

*Garner v. Louisiana*, 368 U.S. 157 (1961) .................................... 28

*Hamling v. United States*, 418 U.S. 87 (1974) ............................. 89

*Herring v. United States,* 555 U.S. 135 (2009) ............................. 98

*Hunter v. District of Columbia*,
    47 App. D.C. 406 (D.C. Cir. 1918) ......................................... 90

*Jeannette Rankin Brigade v. Chief of Capitol Police*,
342 F. Supp. 575 (D.D.C.), *aff'd*, 409 U.S. 972 (1972) ..................... 84

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939) ................................ 55

*Lederman v. U.S.*, 291 F.3d 36 (D.C. Cir. 2002) ........................... 86

*Liparota v. United States*, 471 U.S. 419 (1985) ............................ 27

*Marinello v. United States*, 138 S. Ct. 1101 (2018) ....................... 28

*Maslenjak v. United States*, 582 U.S. 335 (2017) ......................... 73

*Molina-Martinez v. United States*,
    578 U.S. 189 (2016) ............................................................. 101

*Multimedia Pub. Co. of S.C. v.*
*Greenville-Spartanburg Airport Dist.*,
991 F.2d 154 (4th Cir. 1993) ......................................................... 86

*Pennsylvania Dept. of Public Welfare* v. *Davenport*,

495 U.S. 552 (1990) ............................................................ 47

*Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022),
*cert. denied*, No. 22-665, 2023 WL 3158363
(U.S. May 1, 2023) ........................................................ 86

*Rabe* v. *Washington*, 405 U.S. 313 (1972) ...................................... 29

*Russell v. United States,* 369 U.S. 749 (1962) .............................. 91

*Russello v. United States,* 464 U.S. 16 (1983) ............................... 47

*United States v. Alford*, No. 21-cr-0263 ........................................ 62

*United States v. Barry*, Magistrate Case No. 18-00111
    (RMM), WL 2396266 at *1 (D.D.C. June 5, 2019) .............. 50

*United States v. Bass*, 404 U.S. 336 (1971) ................................... 27

*United States v. Brodnax,* No. 21-cr-350-PLF
    (D.D.C.  July 12, 2022) ........................................................ 103

*United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019).............. 81

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005)........33, 34, 36

 *United States v. Carll*, 105 U.S. 611 (1882).........................85, 90

*United States v. Comprehensive Drug Testing, Inc*.,
    621 F.3d 1162 (9th Cir. 2010)(en banc) (per curiam)............ 95

*United States v. Dunnigan*, 507 U.S. 87 (1993)............................ 104

*United States v. Flores*, 912 F.3d 613, 621 (D.C. Cir. 2019) ......... 102

*United States v. Galpin*, 720 F.3d 436, 446–47 (2d Cir. 2013) ..... 95

*United States v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012) ............. 30

*United States* v. *Hatfield*, 591 F. 3d 945, 948 (CA7 2010) ........... 73

*United States* v. *Hess*, 124 U.S. 483, 487 (1888) .......................... 90

*United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014) ................. 30

*United States* v. *Hudson*, 7 Cranch 32 (1812) .............................. 27

*United States v. Lanier*, 520 U.S. 259 (1997) ................................ 29

*United States v Lawrence,* 727 F.3d 386 (5th Cir. 2013)............... 88

*United States v. Leon*, 468 U.S. 897 (1984) ................................... 96

*United States v. Miller*, 799 F.3d 1097 (D.C. Cir. 2015) .............. 92

*United States v. Nance*, 533 F.2d 699 (D.C. Cir. 1976) ................ 91

*United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999) .................. 82

*United States v. Rhine*, No. 21687, 2023 WL 2072450,
  at *6 (D.D.C. Feb. 17, 2023) .................................................. 71

*United States v. Rivera*, 607 F. Supp. 3d 1 (D.D.C. 2022) ............ 71

*United States v. Salamanca*, 990 F.2d 629 (D.C. Cir.),
  *cert. denied*, 510 U.S. 928 (1993) .......................................... 56

*United States v. Turner*, 21 F.4th 862 (D.C. Cir. 2022) ............... 101

*United States v. Verrusio*, 762 F.3d 1 (D.C. Cir. 2014) ................ 84

*United States v. Yakou,* 428 F.3d 241 (D.C.Cir.2005) ................... 95

*United States v. Williams*, 553 U.S. 285 (2008) ........................... 41

*United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) ...... 22

*Washington Mobilization Comm. v. Cullinane,*
    566 F.2d 107 (D.C. Cir. 1977) ............................................... 32

*White House Vigil for the ERA Comm. v. Clark,*
    746 F.2d 1518 (D.C. Cir. 1984) ............................................ 82

*Winters v. New York*, 333 U.S. 507 (1948) .................................... 22

*Wooden v. United States*, 142 S. Ct. 1063 (2022) .......................... 25

## STATUTES

18 U.S.C. § 1752(a) ...................................................................49, 60

18 U.S.C. § 1752(a)(1) ................. 3, 26, 27, 41, 42, 50, 52, 55, 70, 76

18 U.S.C. § 1752(a)(2) ................. 3, 26, 27, 48, 50, 52, 53, 54, 57, 59,
62, 66, 70, 73, 74, 77, 78, 82, 109

18 U.S.C. § 1752(c) ..... 24, 25, 26, 33, 34, 35, 36, 39, 40, 41, 42, 46, 55,
56, 71

18 U.S. C. § 2101 ............................................................................ 49

18 U.S. C. §§ 2101 (a)(1) or (3) .................................................... 49

18 U.S.C. § 2703(a) .................................................................. 95

18 U.S.C. §§ 3141(b) and 3143(b) ................................................ 4-5

18 U.S.C. § 3231 ...................................................................... 1

18 U.S.C. § 3742 ...................................................................... 1

40 U.S.C. § 5104(e) .................................................................. 49

40 U.S.C § 5104(a)(2).............................................................. 71

40 U.S.C § 5104(e)(1) .............................................................. 71

40 U.S.C § 5104(e)(2) .............................................................. 60

40 U.S.C § 5104(e)(2)(A)-(C)................................................50, 76

40 USC § 5104(e)(2)(A)-(F) ...................................................... 91

40 U.S.C § 5104(e)(2)(C) .......................................................... 50

40 U.S.C § 5104(e)(2)(D)............. 3, 26, 49, 50, 52, 53, 54, 62, 66, 81

40 U.S.C § 5104(e)(2)(G).................. 3, 26, 62, 82, 85, 86, 88, 91, 111

D.C. Code § 5-331.03 ................................................................ 58

D.C. Code § 5-331.03 (2)(A) ...................................................... 59

D.C. Code § 5-331.07(e) and (e-1)................................................ 59

**Sentencing Guidelines**

U.S.S.G. §1B1.2 cmt. 1 ............................................................ 108

USSG §§ 1B1.1(a)(1), 1B1.2(a) ...................................................... 102

U.S.S.G. §2A2.4 ........................................................................... 108

U.S.S.G. §2B2.3 ........................................................................... 108

U.S.S.G. § 3C1.1 .......................................................................... 109

## JURISDICTIONAL STATEMENT

These are direct appeals from final judgment in criminal cases. The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231. Final judgments were entered October 3, 2023 [Docs 138 & 140] (A 698, 707) against Cynthia Ballenger (Price) and Christopher Price (together the Prices). The district court extended the date for filing any appeal in the instant cases until November 9, 2023 by minute order dated October 11, 2023.  Timely notices of appeal were filed on October 26, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which confers jurisdiction to review all final decisions of the district courts and 18 U.S.C. § 3742, which confers jurisdictions to review sentences.

## STATUTES INVOLVED

Pursuant to Federal Rule of Appellate Procedure 28(f), relevant authorities are set forth in appellants' Addendum.

## STATEMENT OF ISSUES

1.  Whether the district court's interpretation of "restricted area"

1

under 18 U.S.C. § 1752(c) is in error and whether evidence was insufficient to find the prices walked in a restricted area.

2. Whether the district court's interpretation of disorderly or disruptive conduct under 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D), as included in the Superseding Information for Counts 2-3, is in error, and whether evidence was insufficient to find either engaged in such disorderly or disruptive conduct.

3. Whether the district court's interpretation of the requirement that "such conduct, in fact, impedes or disrupts" Under 18 U.S.C. § 1752(a)(2) is in error and the evidence was insufficient to make such a finding under Count 2.

4. Whether the district court's legal interpretation of the *actus reus* for 40 U.S.C. § 5104(e)(2)(G) is in error and there is insufficient evidence to convict under Count 4.

5. Wheth there was insufficient evidence to meet the mens rea tests under Counts 1, 2, 3 & 4

6. Whether 18 U.S.C. § 5104(e)(2)(G) is facially unconstitutional.

7. Whether the district court erred when failing to grant appellants'

motion to dismiss the superseding information.

8. Whether the court erred in the motion to suppress, renewed motion for judgement of acquittal and motion for new trial because there was an illegal Facebook search warrant, sham search warrant operation, and fundamental violation of the warrant and information from the warrant was important to conviction.

9. Whether sentencing should be remanded because the district court improperly assessed the sentencing guideline calculation and failed to address objections to the statement of offense in the presentencing report.

## STATEMENT OF THE CASE

### I.    The Course of Proceedings and Disposition in the Court Below

The Prices were charged with four misdemeanor counts based on their actions at the United States Capitol on January 6, 2021: entering or remaining in a restricted grounds or building, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building, in violation of § 1752(a)(2) (Count Two); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. §

5104(e)(2)(D) (Count Three); and parading, demonstrating, or picketing in a Capitol Building, in violation of § 5104(e)(2)(G) (Count Four).

After a two-day bench trial and on March 21, 2023, the Honorable Chief Judge James E. Boasberg convicted the Prices on all counts. On September 29, 2023 and by judgment issued on October 3, 2023, the district court sentenced Cynthia Ballenger to 4 months incarceration as to counts 1s-4s to run concurrently, 9 months of supervised release as to counts 1s-2s, $500 in restitution, and $70 in assessment. The district court sentenced Christopher Price to 45 days incarceration as to counts 1-4 to run concurrently, 9 months of supervised release as to 1s-2s, $500 in restitution, and $70 in assessment. At the September 29, 2023 the district court scheduled a status hearing on December 1, 2023 to obtain reports from health care providers regarding a very recent  reoccurrence of prostate cancer in Christopher Price which was confirmed to have moved to lymph nodes (stage IV) prostate cancer and first described to Christopher Price in late September 2023. [See Docs 154, 156]. The district court has scheduled an additional status hearing on this matter for February 29, 2024. The Prices are on bond and, currently, have been ordered to self-surrender for service of the sentences on March 5, 2024.

The Prices provided a motion for release pending appeal on November 12, 2023 pursuant to 18 U.S.C. §§ 3141(b) and 3143(b) for a motion for release pending appeal, and for stay of execution of sentence under Federal Rule of Criminal Procedure 38.  As of this writing, the district court has not ruled on that motion. Here the Prices appeal their convictions and sentencing.

## II.    Statement of Facts

### A. Suspension and Resumption of the Certification Proceedings

According to the stipulation of the parties [Government Trial Exhibit 600] on January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol to certify the vote of the electoral College of the 2020 Presidential elections.  The joint session was fully suspended by about 2:30 p.m.  The Senate and House resumed meeting at approximately 8:06 p.m. and 9:02 p.m. respectively.

### B. The Movement and Conduct of the Prices

On January 6, 2021, the Prices attended then President Trump's rally at the Ellipse.  The approximate times of their walking from the

Ellipse are on a Google walking map that was introduced as a defense exhibit. (A121,125). After spending time at the Ellipse, the Prices walked down Constitution Avenue toward the Capitol but detoured north to go to the West Wing Café. The Prices stayed for about 44 minutes from about 1:49 pm to 2:33 pm at the Café to rest and have something to eat. After the West Wing Café, the Prices walked down New Jersey Avenue and crossed over Constitution Avenue onto the Capitol Grounds.

During trial, the government provided a picture diagram with red markings around part of the Capitol Grounds. (A115). The defense stated numerous concerns regarding authentication of the diagram including lack of personal knowledge by the witness, no indication when the diagram was prepared, no indication whether the diagram was approved by anyone, and no indication of posting prior to January 6, 2021. (A201, A 205-206, 208). Regardless, the evidence also shows the material restrictions possibly underlying the red perimeter diagram did not exist to demarcate a restricted area at the time the Prices walked on the Capitol Grounds. Defense Exhibit 401 (Appendix disk) is a government camera and captures video of people walking over the

pedestrian crosswalk over Constitution avenue and shows some of the grounds south of Constitution avenue as well.   This video shows dozens of individuals crossing onto the grounds with no obstruction at about the time the Prices would be crossing.  There was no barrier at this point.



**Brief Picture 1, Constitution Avenue Screenshot from Defense Video Exhibit 401 (Appendix Disk)**

Captain Baboulis specifically stated portions of the barricades were compromised in the afternoon hours. TR 1 at 52. As discussed in the Statement of Facts, the defense showed videos and other evidence at trial to show material demarcations did not exist at the time of the Price's walk. See, in addition Defense, Exhibit 215 and 216 (Appendix Disk), (A209, 212); Def Exhibit 210 (Appendix Disk)(A64).

The picture is a screenshot from Defense Exhibit 210 from a government video camera reflecting a little after 2:39 pm.



**Brief Picture 2, Southwest Grounds Screenshot from Defense Exhibit 210 (Appendix Disk)**

Captain Baboulis could not say barriers existed at this location at this time and video shows people walking unhindered from the street, even though this is theoretically inside the red perimeter of the morning diagram. At this point in time, if one is walking from further west toward the Capitol, the mall and the grounds look continuous, which is how they usually are. If this was a restricted area it did not remain so.

A Capitol Diagram in the appendix (A19) provides an illustration of the Capitol and shows the north walkway is relative to the Senate Wing Door.   The Senate Wing Doors are not visible from the North Terrace or the Upper Terrace Northwest.

Defense video exhibit 215 (see Appendix Disk) shows that before the Prices arrived there, there were three bike racks and two policemen cordoning off an entry to the north walkway. The video shows that dozens and dozens of people walked by without crossing or challenging the cordon when the police were present, and the bike racks were not moved off to the side.



### Brief Picture 3, Screenshot from Defense Video Exhibit 215 (See Appendix Disk)

Defense exhibit 215 starts and 2 pm—dozens if not hundreds walk by the racks and do not challenge a police officer or the racks.   Many take the step up from the grass to the pedestrian sidewalk and keep walking.  Defense exhibit 310 shows if one wants to avoid the step up one can just go left about 20 feet and there is no step up or low "wall" at all.  At about 2:06 to 2:07 pm, the two policemen leave the scene and leave the bike rack barricades alone. People continue to walk by and not cross the bike racks. At 2:13.14 pm, one individual kicks down a bike rack.

Shortly thereafter another person drags it away. At 2:13:34 pm the same individual kicks down the other two bike racks. With the racks down some people start to walk through the north walkway.  At 2:15:09 pm two different police officers put two bike racks back, although the two racks do not really restrict the walkway.  In any event, those policemen do not stay. Very shortly thereafter, two or three individuals move the racks to the side. These racks do not come into play as restrictions again for the duration in the instant case.

Defense Exhibit 216 (Appendix Disk) starts at 2:39 pm when at least a dozen policeman in yellow jackets take the same step up and walk on the north walkway.  At about 2:41:40 pm - 2:42:30 pm, dozens and dozens more police arrive and walk across the north walkway. None of the police replace a bike rack or guard the entrance. No one is challenging policemen.

At around 2:44 pm, the Prices take the same step up and get to the threshold of the North walkway. The walkway had been fully unrestricted for about 28 minutes and hundreds had crossed. Defense Exhibit 216 continues until 2:48 pm and shows hundreds and hundreds crossing, with others going in the other direction.  In video 215 and 216 one can also observe on right north side of the pictures uninterrupted movement from the alleged restricted area back and forth from Constitution avenue.  There is no barrier and no policemen restricting flow.

This screen shot also shows police stepping up from the grass on to the pedestrian walkway in Defense Exhibit 216.



**Brief Picture 4, Screenshot from Defense Video Exhibit 215 (Appendix Disk)**

The same video shows the time when the Prices arrived at this location which is around 2:44 pm. There were no police officers and the bike racks had been moved to the side. The government does claim that a sign on a misaligned rack up the stairs from the north walkway was evidence of at least prior demarcation or that these were warnings not to be in the general locations. This point is countered below. Unless a bike rack is aligned to block a path, its presence does not mean a restriction except that one should not move the rack to cross it.



**Brief Picture 5, Screenshot from Defense Video Exhibit 216
(Appendix Disk)**

The Prices walked across the Upper North Terrace and then spent

time on the Upper Northwest Terrace.







**Brief Pictures 6, 7 &8 from Defense Exhibit 300 (A126, 127, 128)**



**Brief Pictures 9, 10, & 11 Screenshots From Government Video Exhibit 301  (See Appendix Disk)**

This is on the Upper Northwest Terrace that Christopher Price texts his friend to say "just taking over the Capitol" and "tear gas and bombs going off."

 

**Brief Pictures 12 & 13, from Government Exhibits 107(h) and (i) (A116)**

These points are further discussed below. nal pictures of a peaceful scene or, at least offer no picture evidence otherwise.

The actual Senate Wing Door cannot be observed from this location. According to the government, the Prices are seen in a video from 3:06 pm to 3:08 pm having moved on from standing at the Upper Northwest Terrace to the part of the Upper West Terrace.



**Brief Picture 14, Prices On Upper West Terrace
from Defense Exhibit 300 (A129)**

The evidence shows the Prices walk through an open Senate door at about 3:22:44 pm. Defense Exhibits 303, 400 (A137-139, Appendix disk). There is no evidence this door was closed at the time the Prices were on the West Terrace.   At the time of entry there is no indication or evidence that any of the police officers inside, but near the door, tells the Prices not to enter.



**Brief Picture 15 from Defense Exhibit 303 (A137)**

There is a clear police cordon or line preventing anyone from going north. At less than one-minute walking south, the Prices encounter, and Christopher Price takes a picture of a police officer with the lettering A. Tax on his shirt.

 

**Brief Pictures16 & 17 from Defense Exhibit 303 (A138)**

The Prices never go further south than officer A. Tax.  From the video, no one who enters during the time the Prices are in the foyer go further south than officer A. Tax.  The Prices spend the remaining approximately 5 ½ minutes turning around and standing peacefully in line to exit the Senate Wing Door which they do at about 3:29 pm.

Fortunately for the Prices, every second of the Prices' walk and standing in line inside the Senate Wing Door is entirely captured on government video.  The defense went through the video minute by minute and the primary government witness, Lt. Grossi was forced to

admit **<u>no one</u>** was pushing or challenging any police officer while the Prices were in the foyer. (A238-241). He further stated that the actual police cordon restricting going north was effectively prevented people from going north inside the door. Id. at A240. Lt. Grossi had no information about what was outside of the Senate Wing Door. Id. Captain Baboulis had neither testimony regarding the Prices in the Capitol nor outside the Senate Wing door. Defense Counsel asked related questions of Special Agent Belcher at (A331):

> Q: …it seems like the Prices walk in, get in line, and walk out. Is there is something different that you found in your investigation?
>
> A: No.
>
> Q: And in your investigation, did you investigate anything outside of the Senate Wing Door. That is to say, in the area outside of it, were you able to talk to anyone or you, ask what the situation looked like there?
>
> A: No.

## C. Certain Police Steps Inside the Small Foyer After the Prices Leave

During cross-examination of Lt Grossi, the defense introduced and showed two video exhibits from the same camera inside the small foyer. In defense exhibit 201, the defense emphasized the point at which a

police officer came nearer the door and started gesturing that people

should not come in and should move back out of the line to come in.



**Brief Picture 18, Screenshot from Defense Video Exhibit
201 (See Appendix Disk)**

The video is clear that people did not come in after this point.

Everyone one was cooperating. Simple notice was sufficient for people

to not enter.

In defense video exhibit 202, the time forwards to 4:15 pm when

there are many, many police officers gathered in the small foyer

apparently waiting before taking any other action. There are still people

outside the door, but none come in.

**Brief Pictures 19, Screenshot from Defense Video 202 (See Appendix Disk)**

## SUMMARY OF ARGUMENT

The government and district court fail to make proper legal interpretations and/or fails to show that evidence lines up behind a proper legal interpretation of the essential elements of each count.

The Prices cannot legally be convicted based on the ghost of a perimeter under 18 U.S.C. § 1752(c) that does not materially exist at the time of the Prices' walk. For the Capitol grounds and upper terrace where the Prices walked the government also failed to show that a protectee was expected to be at any such area as required under 18 U.S.C. § 1752(c) for a restricted area. Regardless of the § 1752(c) argument, the lower court found that there was reasonable doubt whether the Prices knowingly entered a restricted area with

respect to entering the grounds near Constitution Avenue. (A506). In the district court's memorandum of opinion (Rule 29 Opinion) [Doc 127] (A597) the district court claimed certain events or items the Prices observed could make an area an "otherwise restricted area." This is an illegal interpretation of law.

With respect to entering the small bubble of the foyer inside the Senate Wing Door, the district court interprets two legal terms under 18 U.S.C. § 1752(c) incorrectly.  First, district court's reading of "cordoned-off" is antithetical to this legal meaning.  One can walk in front of a police cordon and that is not violating a cordon, unless the police instruct otherwise.  The district court also misinterprets the statutory term "otherwise restricted area".  The district court illegally argues that observations of the Prices about people or sounds and sights substitute for the government placed elements that demarcate a restricted area.  Based on proper legal interpretations there is insufficient evidence to convict the Prices under Count 1.

The Prices further argue there is improper legal interpretation concerning the *mens rea* requirements under 18 U.S.C. § 1752(a)(1)

given the misinterpretations of 18 U.S.C. § 1752(c) and there is insufficient evidence to convict on that basis as well.

The district court properly did not find that the Prices engaged in "disorderly conduct" under 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D). At trial, the district court further found the conduct of the Prices—peacefully walking and standing in line-- would not be "disruptive conduct" under 18 U.S.C. § 1752(a)(2) or 40 U.S.C. § 5104(e)(2)(G) or demonstrative conduct or "to demonstrate" under 40 U.S.C. § 5104(e)(2)(G), if viewed just based on the individual conduct of the Prices.

The district court still convicted the Prices on Counts 2-4 based on a misreading of law and insufficient evidence even to support the meet the standard of the district court's misreading of law.  At closing argument and no earlier, the Government argued, and the district court adopted, as the key legal element for Counts 2-4 that the Prices "joined" a "mob".  This "joining" purports to transforms otherwise non-disruptive conduct and, similarly, non-demonstrative conduct into violations of law.   The Prices address the many levels of legal error that flows from the district court's approach.

The Prices further argue the district court misinterprets the clause under 18 U.S.C. § 1752(a)(2) requiring the government to show that "…such conduct, in fact causes…" can be as little as mere presence. This error also does not allow conviction under Count 2 to stand.

The Prices further argue both that the district court ignored or misinterpret specific statutory elements and interpretations with respect to both the *actus reus* and *mens rea* issues under Count 4 and that there is insufficient evidence to convict.

The Prices argue separately there is insufficient evidence to convict under the separate *mens rea* tests for Counts 1, 2, 3 & 4.

The Prices argue that 18 U.S.C. § 5104(e)(2)(G), the basis of Count 4, is facially invalid based, primarily, on a specific argument that it is unreasonable to punish modes of First Amendment conduct, for no other reason than such modes are First Amendment conduct, when ordinary rules of crowd management can fully address the Congressional concerns. The facial challenge is further valid because the district courts have shown, by inconsistency, inability to address certain important issues of overbreadth and

vagueness, and the inability to maintain proper narrowing constructions.

Procedurally, the Prices argue the Superseding Information for each defendant fails to provide allegations of essential fact and the nature of the case in violation of Federal Rule of Criminal Procedure 7(c) and 12(b) and the Fifth and Sixth Amendment. The Prices had no reason to evaluate or address the constructs of a "joining" or "the mob" as legal elements or transformative context.

The Prices further argue that the Facebook search warrant and operation of the search warrant was a sham in violation of the Fourth Amendment. The district court erred in denying a motion to suppress and in its Rule 29 and Rule 33 opinions. Evidence from the search warrant or derived from such evidence was significant a trial. The delivery to the prosecution and subsequent search by the prosecution of the full data dump that was supposed to be "sealed" is bad faith with respect to the Search Warrant.

The Prices further argue that the district court did not make the proper sentencing guidelines assessment and failed to make rulings regarding the Price's presenting report regarding the

description of defense conduct and that the sentencing should be

remanded to address these issues.

## ARGUMENT

## I. Certain General Rules of Statutory Construction and Constitutional Principals Favor the Prices in the Instant Case

The government and the district court claim extraordinarily broad

view and enlargement of the scope of criminal conduct by novel and

erroneous statutory construction with no statutory or case support

outside of January 6th cases.

### A. Congress Defines a Federal Crime Not the Courts

The definition of the elements of a criminal offense is entrusted to

the legislature, particularly in the case of federal crimes, which are

solely creatures of statute. [Citing *United States* v. *Hudson*, 7 Cranch

32 (1812)].[footnote omitted] *Liparota v. United States*, 471 U.S. 419,

424, 105 S. Ct. 2084 (1985). See also *United States v. Bass*, 404 U.S.

336, 348 (1971) ("[L]egislatures and not courts should define criminal

activity.")

### B. Congress Must Provide the Ascertainable Standard of Guilt

The "initial inquiry is necessarily to determine the type of conduct proscribed by [a] statute and the elements of guilt which the evidence must prove to support a criminal conviction" *Garner v. Louisiana*, 368 U.S. 157, 165 (1961). As stated in *Winters v. New York*, 333 U.S. 507, 68 S. Ct. 665 (1948) at 515-516.:

> The crime "must be defined with appropriate definiteness." [citations omitted] …There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment. [Footnote omitted] The vagueness may be from uncertainty in regard to …the applicable tests to ascertain guilt. [Footnote omitted]

### C. Courts Must Show Restraint Unless a Broad Scope of Criminal Conduct Is Clear or Plain from the Statute

"Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a 'narrow interpretation' appropriate." *Dowling v. United States*, 473 U.S. 207, 213 (1985).  As stated in *Dowling*:

> Thus, the Court has stressed repeatedly that "`"when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."'" *Id* at 214. [Citations omitted].

See also *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018)

*United States v. Lanier*, 520 U.S. 259, 267 (1997) states…"due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope [citations omitted]. "To avoid a finding that a statute is unconstitutionally vague "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*. at 267.  *See also Bouie v. Columbia*, 378 U.S. 347, 355 n.5 (1964). (Reversing trespass convictions, finding that they rested on an unexpected construction of the state trespass statute by the State Supreme.); *Rabe* v. *Washington*, 405 U.S. 313 (1972) (Reversing a conviction under a state obscenity law because it rested on an unforeseeable judicial construction of the statute).

The recent Supreme Court case *Bittner v United States* 143 S. Ct. 713 (2023) states:

> To the extent doubt persists at this point …. a venerable principle supplies a way to resolve it. Under the rule of lenity, this Court has long held, statutes imposing penalties are to be "construed strictly" against the government and in favor of individuals. (Citing *Commissioner v. Acker*, 361 U. S. 87, 91 (1959)) *Bittner* 143 S. Ct at 724.

…. as Acker acknowledged, "[t]he law is settled that penal statutes are to be construed strictly," and an individual "is not to be subjected to a penalty unless the words of the statute plainly impose it." *Id.* [Citation omitted]

*Bittner* states fundamental Constitutional principles that apply,

including in the context of lenity, where there is "doubt" or even where

a statute does not "plainly impose it."

## II. The District Court Interpretation of a Restricted Area Under 18 U.S.C. § 1752(c) is Error and Evidence was Insufficient to Find the Prices Walked in A Restricted Area

### A. Standard of Review

This Court reviews questions of statutory interpretation *de*

*novo. See United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir.

2014). The Court also reviews insufficiency claims *de novo*,

considering whether, "after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable

doubt." *United States v. Gaskins*, 690 F.3d 569, 576 (D.C. Cir. 2012).

### B. The Ghost of Former Restricted Area, Even if Previously Established, Does Not Satisfy 18 U.S.C. § 1752(c)

Under 18 U.S.C. § 1752(c), an area cannot qualify as a

"restricted area" in a "restricted building or grounds" unless 1) it is

"posted," "cordoned off," or "otherwise" demarcated as "restricted";

and 2) it falls into one of three qualifying categories, one of which is that a Secret Service protectee is visiting or expected to visit.  The government presented a restricted perimeter map as an exhibit.  The question and lack of answers discussed in the statement of facts above regarding the red perimeter is enough that the diagram and the testimony of Captain Baboulis on the matter is insufficient evidence. Regardless, the government failed to establish that, by the time the Prices entered the Capitol Grounds from Constitution Avenue, the perimeter materially existed. Time and location matter. Unlike the White House or its grounds, neither the Capitol Grounds nor the Capitol Building are per se restricted areas for purposes of 18 U.S.C.§1752(c) and 18 U.S.C.§1752(c) demarcations are temporary.

As discussed above, the evidence is clear there were no longer presented material restriction at the time of the Prices walk. The district court's response to this, not during trial but in the Rule 29 Opinion is:

> Rioters' success in knocking down barriers and doors, however, does not strip an area of its restrictions.  [A602]

This statement reflects an illegal interpretation of the requirements of §1752(c). Material existence of postings, cordons, or other restrictions at the time someone "enters or remains" is consistent with common-sense understanding; the requirement for actual demarcation is one element of fair notice set out by specific mechanisms in the statute.

The government may prosecute those that moved material restrictions with a variety of criminal sanctions. As an example, rather than the broad term "rioters" the evidence a trial is that a single individual kicked down the bike racks at the north walkway and 2 to 4 additional people moved them aside.  The Prices did not commit such an act and were not present when such movement occurred.

**C. A Protectee was Not on And Was Not Expected to Be on the West Grounds or the Upper Terrace North East, Upper North Terrace, Upper Terrace Northwest or Upper Terrace West as Required for Restricted Grounds Under 18 U.S.C.§ 1752(c)**

The Government provided no stipulation, testimony or evidence to establish an area of the grounds where the President or other person protected by the Secret Service is or will be temporarily visiting on January 6th included the grounds traversed by the Prices, including the

Upper Northeast Terrace, the Upper North Terrace, the Upper

Northwest Terrace or the Upper West Terrace.  Accordingly, the

government fails to establish an element required under 18

U.S.C.§1752(c) with respect to areas outside of the Capitol Building.

Neither the district court nor the government challenged this legal

interpretation which was clearly made and there are insufficient facts

to support the requirement.

### D. The Location and Operation of the Actual Police Cordons Inside the Senate Wing Door When the Prices Approached the Door and Entered Defines the Any Restricted Areas Under 18 U.S.C.§ 1752(c) at That Time and Location

Defendants have consistently taken the position that the bubble

area the Defendants walked into inside the Senate Wing Door was not

restricted based on the specific location of the police line and operation

of the police cordon at the time.  The Prices' interpretation is fully

supported by *U.S. v. Bursey*, 416 F.3d 301 (4th Cir. 2005), which

construes the definition of restricted area under 18 USC §1752(c).   In

*Bursey*, the Court found that law enforcement agents themselves

defined the cordoned off area by their position:

> Stationing agents at along an areas perimeter squarely falls
> within the plain meaning of the term "cordoned off," that is, "a

line or series of troops or of military posts placed at intervals and enclosing an area to prevent passage' or "a barrier of any kind operating to close off, restrict, or control access." Websters Third New International Dictionary (1976). *Id.*

In *Bursey,* police also told Bursey several times he was in a restricted area and told him if he did not leave, he would be arrested. *Id.* at 305 and 308.

The Prices reading is further consistent with the police line regulation described in *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 118 (D.C. Cir. 1977) (A regulation prohibiting the crossing of a police line comports with the Due Process Clause so long as "the location of the line is clearly indicated and if adequate notice is given").

That one can walk in front of police line is the universal understanding of police lines in America. There is no law or other case to the contrary.

In its Rule 29 Opinion the district court states:

Their only challenge to that finding is that police were cordoned within, rather than outside, the Senate Wing Door, and that this cordon was not pushing back against the crowd that entered through the breached doorway. [citation omitted]. Opinion at 7. (A603).

The Prices challenge the finding because:

1) The position of the police line that materially exists at the time defines what is and what is not cordoned off; the police did not cordon off entering the door.

2) At the time of the Prices walk, there is no evidence anyone was pushing, either police or citizens, and no evidence anyone was challenging an officer.

3) There is no evidence that there was an officer or sign, inside or outside, indicating not to enter

4) The evidence shows that all an officer needed to do was say something or point a finger and citizens fully complied.

The district court in the instant case held that "[u]ltimately, the officers created a line to prevent people from going north from that foyer upon the Senate wing door entry." (A502). This statement of the district court is correct and defines the cordon as the testimony did.

The Defense pointed out that the government video showed dozens of citizens were in line, entered with a police cordon off to the left (north) side, and took basically the same short route as the Prices, to the effect they walked south for about a minute, and then never went past officer A. Tax. All get in the line going the other way to exit.

The district court claims an external cordon also has some alleged legal impact on the situation at the Senate Wing Door:

> Ballenger, however, admitted on the stand that an additional "line of Metropolitan Police Department officers in bright yellow jackets" stood outside the Capitol, guarding it from the outside. <u>See</u> Tr. II at 101. Rule 29 Opinion at 7.(A603)

A simple review of the transcript shows Cynthia Ballenger (Price) did not say the line of police officers outside, which were not near the Senate Wing Door at all, were guarding the Capitol building or the Senate Wing door. That external line was its own specific cordon that, like in *Bursey*, defined a specific area by the location of the line at the time.

The district courts interpretation is at odds with the proper definition of the term "cordoned-off" and there is insufficient evidence to argue the Prices violated a cordon.

## E. The District Court Misreads 18 U.S.C.§1752(c) Term "Otherwise Restricted Area"

In its Rule 29 Opinion the Court argues there is a list of alleged observations by the Prices which should fall under the term "otherwise restricted area". The court states "flash bangs, sirens, blaring alarm,

broken glass, and tear gas that Defendants encountered were sufficient to mark the areas as restricted." (A602).

The district court confuses a *mens rea* analysis with §1752 (c) requirements. The question of whether an area is restricted for purposes of 18 U.S.C.§1752(c) cannot vary based on the different paths or observations of different people in different locations. A demarcation is something set out by the government. No witness identified the court's observations of restriction as elements to demarcate a § 1752(c) restricted area. Here the Prices address these issues. The district courts interpretation of otherwise restricted area is incorrect. There is insufficient evidence of restrictions to override the lack of postings and, importantly, the actual operation of the actual police cordon.

### 1. The Loud Boom Before the West Café Did Not Demarcate A Restricted Area

The Prices heard a loud boom before sitting down to eat at West Café. Loud booms are not usually directional. The sound heard near the West Café does not demarcate anything for purposes of §1752 (c) or identifies a restricted area at the time of the Prices walk. Any further discussion of flash bangs is not relevant as Cynthia had no direct

knowledge of where any sound was occurring at the time and nothing demarcates an area.

## 2. Fire Engines with Lights And, Separately, Intermittent Police Sirens On Constitution Avenue Did Not Demarcate A Restricted Area

The Defense presented video to show dozens and dozens of people were walking from Constitution avenue to the Capitol Grounds and beyond with no obstruction –meaning no barriers—at about the time and location that the Prices would be crossing. Defense Exhibit 401(Video Disk).  The court agreed the government had not proved beyond a reasonable doubt that the Prices entered the grounds with knowledge of a restricted area. (A506) With respect to the same video, the district court noticed there were one or more fire engines with lights at the crosswalk.   Separately, the government and district court observe that in government exhibit 301(Video Disk), that one can hear intermittent police car sirens, presumably somewhere on the streets but not on the Grounds. The district court is in error to ascribe legal meaning to either of these points for purposes of §1752 (c) or §1752 (a)(1).  Police cars with sirens and fire engines with lights on the street

occur in Washington D.C. all the time and do not denote and in this case did not demarcate a §1752(c) restricted area.

### 3. The 1-Foot Curb Not Separating Restricted from Non-restricted Areas Does Not Demarcate a Restricted Area

In the Rule 29 Opinion the court highlights the following statement:

> Defendants entered the Capitol grounds area by "stepping over an Olmsted wall and pass[ing] snow fencing" and "bike racks that were down." [Citing Trial Transcript 2 at 167–68.] (A599).

This statement is clear error in that the curb or low wall is not located where the Price entered the Capitol Grounds. Beyond that, the step has no legal significance as 1) the structure looks like a curb and not a wall to ordinary people, 2) there are no signs anywhere indicating not to do step on this structure, 3) many police officers are shown taking the same step, and 4) the step did not separate restricted from non-restricted areas.

### 4. The Fleeting Sign on A Lone Bike Rack Did Not Demarcate An Otherwise Restricted Area

The Rule 29 opinion misstates important testimony. The court states:

…..ample evidence supports the Court's finding that they observed these and other restrictions.  [Citing A432] (Ballenger testifying to "walk[ing] right past" bicycle racks and an "area closed" sign) (A570)

This issue is first set out as information from a short video Cynthia took upon stepping to the North Terrace from the north walkway. (A433).  The government does not claim the bike racks were barriers in the sense of blocking the path of the hundreds of people traversing at that point.  The racks were aligned differently and was a single rack. As such, this bike rack and sign has no legal relevance toward demarcating a restricted area but may be another ghost of a perimeter.  The sign that appears for a fraction of a second on a video Cynthia Ballenger took.  Cynthia Ballenger says she did not recall seeing this at the time (A433).  She says that she did walk past it, upon the government focusing on this fractional moment on the video at trial.  Cynthia also said there is no barricade, presumably, because the rack and sign were not then lined up as a barrier.  (A434).

Cynthia is walking forward. It is not reasonable to conclude over her objections that she observed fleeting information on the right side of her screen.  Moreover, as Cynthia stated it is not a barricade that is in

the way.  Here Appellants illustrate with screen shots but there is also a 12-second clip included in the Appendix disk.



**Brief Pictures 25, 26, 27, 28 Screenshots from Government Video 301 listed at 6, 7, 8, & 9 seconds in. (See Appendix Disk)**



**Brief Pictures 29, 30, 31, 32 Screenshots from Government Video 301 all listed at 10 seconds in. (See Appendix Disk)**



**Brief Pictures 33 & 34 Screenshots from Government Video 301 all listed at 11 seconds in. (See Appendix Disk)**

It is unfair and clear error to argue Cynthia Ballenger registered this item as an observation beyond a reasonable doubt. Moreover, the government has not stated what is the "restricted area" demarcated by this bike rack and sign or how the rack and sign describe or demarcate an area. This point makes the observation of no legal relevance with respect to §1752(c) demarcations.

### 5. The Prices Did Not Encounter Tear Gas On The Upper Northwest Terrace or West Terrace Before At The Time Of Being In Those Areas

The district court states the Prices encountered tear gas based on a text of Mr. Price saying "tear gas and bombs going off" directly attached to a picture where no such things were occurring. This was

sarcasm.  The issue is was there tear gas or bombs going off on the Upper Northwest Terrace or Upper Terrace that the Prices encountered. There is no evidence in video, picture, picture, testimony or general understanding of the scene on the Upper Northwest Terrace at the time. Government exhibit 301 (Appendix Disk) is a video taken by Cynthia Ballenger that covers the walk on the Upper North Terrace. On the Upper Northwest Terrace, where Chris Price takes the picture attached to the text there is no tear gas.  There are several pictures from this location at the relevant time.  The picture Chris Price took was at the same time Cynthia Prices recorded a video, government exhibit 300 (Appendix Disk) which shows Chris taking that picture on the Northwest Terrace. Cynthia then pans around. There is nothing but people who are peaceful and no tear gas. None of the pictures or videos provided as evidence in the trial show the deployment of tear gas on the Northwest terrace or West Terrace or the effects of such deployment when the Prices were on the Upper Terrace. There is a picture with a pink puff from the ground the ground below but that is not tear gas. The government never questioned Cynthia Ballenger about tear gas because there was no evidence of tear gas on the Northwest Terrace.

There are government closed circuit cameras on the Northwest Terrace and West Terrace. Government exhibit 202 (c) (Appendix Disk) is an example of one such camera. These videos would have caught such deployment and government surely would show it if there was such deployment. There is also no evidence that the line or any police officer was deploying tear gas.  Instead, on the Upper Terrace the police are standing in a disciplined cordon.

The defense confronted Special Agent Belcher directly with the question whether he had evidence of tear gas on the Upper Terrace Northwest at the time Prices were there and Chris took the picture connected to the text. Special Agent Belcher ducked it and said "I don't know exactly at what point in time that he sent the text." (A324). Special Agent Belcher had no evidence to offer and had no personal knowledge. The district court properly does not cite to any such observation from Special Agent Belcher, only to Special Agent Belcher's presenting the text of Chris Price.

The district court's finding, based only on the text of Chris Price, is clear error and not supported by sufficient evidence in the face of overwhelming evidence, logic, and context to the contrary.

III.    **The District Court's Legal Interpretation Disruptive Conduct Under 18 U.S.C. § 1752(a)(2) And 40 U.S.C. § 5104(e)(2)(D), as Included in the Superseding Information for Counts 2-3, Is Error and Evidence Is Insufficient to Convict the Prices Under Those Provisions**

A. **Standard of Review**

The Prices are entitled to the same de novo standards of review set out in Section II (A).

B. **The District Court Properly Did Not Find That the Prices Engaged in "Disorderly Conduct" and Properly Found at Trial that Individual Conduct of the Prices on Their Own Would Not Be "Disruptive Conduct"**

At trial, the district court properly found that peacefully walking and standing in line to exit was not "disorderly conduct" and did not find that the Prices engaged in "disorderly conduct". The district court also properly ruled at trial that the conduct of the Prices would not be "disruptive conduct" on its own.

The Prices will further discuss certain issues concerning the district court's discussion of disruptive conduct in its Rule 29 Opinion.

C. **"Disruptive Conduct" Must Be More Than "Entering or Remaining" Based on the Context of the Other Provisions in 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)**

The government seeks to turn an alleged "entering" violation, covered under 18 U.S.C.§1752(a)(1), or "being" into the "disorderly and disruptive conduct" elements required under 18 U.S.C.§1752(a)(2) and 40 U.S.C.§ 5104(e)(2)(D).  40 U.S.C. §5104(e)(2)(A)-(C) use the terms "enter or remain" in specific settings in the Capitol Buildings. For example, 40 U.S.C.§ 5104(e)(2)(C) makes it a violation if a defendant "..with the intent to disrupt the orderly conduct of official business, <u>enters or remains</u> in a room in any of the Capitol Buildings set aside or designated for the use of ….." (emphasis added).  If Congress had meant entering or remaining in a hallway was a violation under the 40 U.S.C. §5104(e)(2) series, Congress would have said so.  The fact that "enter or remain" is specifically listed under 40 U.S.C. § 5104(e)(2)(A)-(C) means entering or remaining is not itself a crime in other locations.

The same analysis applies for entering or remaining under §1752(a)(1) which is only a crime in a restricted area.  Under §1752(a)(2) disorderly or disruptive conduct can occur both in a restricted area or "within such proximity to".  If "presence" is disruptive conduct, then this could make entering or remaining within such

proximity to a crime.  Obviously, Congress did not intend that in specific language.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23 (1983) (quotation marks and citation omitted; alteration in original). As stated by the Supreme Court:

> Our cases consistently have expressed "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Pennsylvania Dept. of Public Welfare* v. *Davenport*, 495 U.S. 552, 562 (1990).

As stated in *Marinello* "… we have not found any case from this Court interpreting a statutory provision that would create overlap and redundancy to the degree that would result from the Government's broad reading of § 7212 —particularly when it would " 'render superfluous other provisions in the same enactment.' " [Citations omitted] *Marinello* 138 S. Ct. at 1107-1108.

As discussed below, "enter or remain" also cannot be transformed to "parade, demonstrate, or picket" which must mean discretely different and additional conduct beyond entering or remaining—with or

without other people. Similarly, § 1752(a)(2) "disorderly or disruptive conduct" must be different and more than § 1752(a)(1) entering or remaining.

### D. For the *Actus Reus* under §1752(a)(2) and § 5104(e)(2)(D) The Adjective "Disruptive" Applies to the "Conduct" Of A Defendant and Not to Surrounding Circumstance or The Conduct of Others or the Impact

*United States v. Alford*, No. 23-3023 (D.C. Cir. Jan. 5, 2024) provides points regarding dictionary definitions of disruptive but not a dictionary definition of the adjective/noun combination "disruptive conduct":

> Unlike disorderly conduct, "disruptive conduct" is not a term of art and has only its plain meaning. When the two provisions here were enacted in 1967 and 1971,[1] the adjective "disruptive" carried the same familiar meaning that it does today: "causing or tending to cause disruption." 1 Webster's Third New Int'l Dictionary 656 (1966). And "disrupt" meant "to throw into disorder or turmoil" or "to interrupt to the extent of stopping, preventing normal continuance of, or destroying." *Id.*; *see also* Webster's Ninth New Collegiate Dictionary 366 (1984) (defining "disrupt" as "to throw into disorder" or "to interrupt the normal course or unity of").

> In § 1752(a)(2) and § 5104(e)(2)(D) the adjectives disorderly or

disruptive for purposes of the *actus reus* both modify the same noun,

---

[1] *See* Act of Oct. 20, 1967, Pub. L. No. 90-108, 81 Stat. 275, 276 (1967); Pub. L. No. 91-644, § 18, 84 Stat. 1880, 1891–92 (1971).

which is "conduct". This is the key textual connection and cannot be overlooked and cannot be severed.

Under Black's Law Dictionary 5th edition "conduct" the noun means "personal behavior, deportment, mode of action; any positive or negative act." Under Black's Law dictionary (8th ed. 2004) *actus reus* is the "wrongful deed that comprises the physical components of a crime." Merriam-Webster online dictionary defines "*actus reus*" the noun as the wrongful act that makes up the physical action of a crime. Disruptive conduct under Black's Law Dictionary 5th edition is disorderly or contemptuous or contemptuous conduct, generally within the framework of a judicial or quasi-judicial proceeding. In the instant case, it is the physical conduct or deed that is the noun in "disruptive conduct". Mere presence is not disruptive conduct.

### E. Appellants Found Only One Conviction Under § 1752(a)(2) Or § 5104(e)(2)(D) Prior Which Provides No Case Law Basis Prior To January 6th Cases for The District Court's Novel Constructions

The *Alford* appellate opinion notes that § 1752(a)(2) and § 5104(e) have been around since 1971 and 1967 respectively. To Appellants' knowledge there is one case of conviction under the disorderly or

disruptive conduct of provisions of § 5104(e)(2)(D) and none under §1752(a)(2).  In *United States v. Barry*, Magistrate Case No. 18-00111 (RMM), WL 2396266 at *1 (D.D.C. June 5, 2019) involved § 5104(e)(2)(D) and § 5104(e)(2)(G). The fact pattern involves police warnings, Mr. Barry pulling out a large sign, standing on his chair, and shouting in the direction of the hearing committee members. *Id*. at 1-2. When approached by the officers, Mr. Barry allegedly leapt from his row of chairs, causing a chair to dislodge towards other attendees behind him, allegedly injuring another hearing attendee, and continued to should while being carried out by his arms and legs. *Id*. at 2. The case offers not support that the novel and incorrect interpretation that a party that peacefully walks, stands in line to exit and never disobeys and order of an officer is guilty of these provisions.

### F. There Is Insufficient Evidence to Convict the Prices Under Traditional Rules of Statutory Construction and Case Law Prior to January 6th Cases

#### 1. Peacefully Standing in Line to Exit is Not Disruptive Conduct or Any Crime

The government appears to accept that a crime must involve voluntary conduct. *See* Gov't Opposition to Rule 29 and 33. [ECF 112

footnote 3.] (A566). The Prices time standing in line to exit the small

foyer was not voluntary. The Prices did not an should not push their

way out any faster.  Civilized people stand in line to exit and there were

no other options other than standing in line to exit in the small foyer.

By peacefully standing in line to exit the Prices neither voluntarily

"remained" nor engaged in "disorderly or disruptive conduct".

### 2. Entering the Small Foyer and Walking South For 1 Minute, Even If a Violation of § 1752(a)(1), is Not Disruptive Conduct

Most all of this section comes to this issue. The Prices have above

argued that the government did not maintain a § 1752(c) restricted area

in the areas where the Prices walked.  The Prices have also argued that

even if the Courts finds the government established there as a §1752(c)

restricted area based on some theory like the ghost of a perimeter

matters, the Prices did not know they walked in a restricted area.  Even

assuming this Court does not vacate the district court's rulings under

Count 1, there is insufficient evidence for conviction under Count 2 and

Count 3 because the 1-minute walk was not disruptive conduct. Simple

entering or remaining is not disruptive conduct.  The Prices never

disobeyed an instruction of the many officers there.

### 3. Being or Remaining on the Upper Terrace Is Not Disruptive Conduct

In a similar manner, the Prices conduct was always peaceful, polite, and there is no evidence the Prices disregarded and instruction by an officer.  There is no disruptive conduct.

### G. The Lower Court's Key Findings and Illegal Ruling Is That Otherwise Non-Disruptive Conduct Satisfies the *Actus Reus* Under Counts 2-3 By Stating the Prices "Joined" A "Mob"

The government argued for the first time in closing statement, and the district court held, that an alleged relationship between the Prices "joined" and the other people ("the mob") transforms the actual conduct of peacefully walking and standing in line for a short time into "disruptive conduct" under Counts 2 and 3.   Here is the critical passage in the government's closing statement:

> Ms Akers: Next, your Honor, Count 2, 1752 (a)(2), the conduct here, the conduct element is met because these defendants joined a mob.  They were participants in the mob. And a mob is not one without participants. (emphasis added) (A470)

> Court: So they did didn't have to do anything disruptive in the Capitol beyond being in there among the other people?  That's the argument right? (emphasis added) (A471).

> Ms. Akers:  That's the argument your Honor…Trial Transcript March 21, 2023 (A471)

Just to be clear, there is no other reason given by the government in the

trial transcript for the §1752(a)(2) *actus reus* finding than the above

statement.

> In the Court's Rule 29 opinion court states:

> At trial, the Government acknowledged that Defendants did not
> "yell[], break[] things, block[] people, jostl[e]," or "threaten[] in
> some manner," and that their disruptive conduct consisted of their
> "being part of th[e] mob" that stormed the Capitol, even if their
> outward contribution to that mob consisted of little more than
> "walk[ing] in" with its members.  See Tr. II at 137. Opinion at 10.
> (A606)

The government stated the same argument is the basis for Count 3.

The Government constructs were fully adopted by the district court

and key to the ruling:

> And the government generally agreed that if this conduct had
> taken place in a vacuum, it might well not be disruptive. But the
> fact that the mob clearly disrupted, did, in fact, impede and
> disrupt the orderly conduct of government and that they were part
> of this mob that did so….. (A506-507). (emphasis added)

Note, in the district court statement, it is the "mob" that "disrupted"

and no actual finding that the Prices independently "engage" in

"disruptive conduct".

> For Count 3, the lower court, in part states:

… Similarly, I find that they did engage in disruptive conduct for the reasons I set forth in Count 2…And again, they would not be guilty if they had acted by themselves.  (A507)

… So the fact that they were--- that they formed part of a group that by entering the building….*Id.*

## H. The Prices Are Charged as Individuals and Not with Alleged Relationship to the Conduct of Others

Congress, not the courts, identifies whether, where and how a prosecution can make a case based, in part, on the relationship of the conduct of individuals to the conduct of others.

18 U.S.C. § 1752(a) states:

(a) Whoever--- (2) knowingly, and with intent to impede or disrupt the orderly conduct of government business or official functions, <u>engages in disorderly or disruptive conduct</u>, in or within such proximity to, any restricted building or grounds when, or so that, <u>such conduct</u>, in fact impedes or disrupts the orderly conduct of Government business or official functions (emphasis added)

Under §1752(a)(2), the terms "engages" and "disorderly or disruptive conduct" and "such conduct" can only refer to the conduct of the individual defendants in the case, and not the conduct of any other party.

Under § 1752(a), the government could have charged, but did not charge, the Prices with the statutory term "conspires" which is

available at the end of § 1752(a). § 5104(e)(2) also provides an option as
to whether to charge an "individual" or a "group of individuals".
Defendants were each charged as individuals and not as part of a
"group of individuals". Presumably, under the latter approach, the
government would have an obligation to at least identify the group of
individuals.

The terms "mob", "joined a mob", or "participants in a mob" were
not brought up in the governments proposed definition of either
disorderly or disruptive conduct, in the government's case in chief, or
anywhere in the trial until government counsel argued those terms in
her closing statement. (A470).

Neither the government nor the Court sufficiently explain 1) what
statutory text provides for the distinction or element of a "joining" 2)
what element of conduct or *actus reus* was involved in the "joining", 3)
what constitutes the group called a "mob", 4) who did the Prices
specifically join; 5) whether the joining is defined by time and location;
and 6) what part of the conduct, if any, of the Prices was mob-like.

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939) addresses the
definition of "gang" and membership in a "gang" in a criminal statute

and found the terms Constitutionally vague. Among other items,

dictionary definitions of the word gang "are numerous and varied ". *Id.*

at 454.  The statute fails to indicate what constitutes membership or

how one may join a gang.  *Id.* at 459.

In its Rule 29 Opinion the lower court fails to answer the

questions raised by the defense in the rule 29 motion. Instead, the court

counters with an aiding and abetting example:

> Context and circumstances always matter.  A person standing on
> a public sidewalk scanning the street commits no crime, but he
> certainly does so if he is acting as a lookout for others committing
> a burglary next door. (A606).

The Prices were not charged with aiding and abetting. Congress

has written specific provisions for aiding and abetting. It is well settled

that mere presence at the scene of a crime and awareness that a crime

is being committed is insufficient to support a conviction for aiding and

abetting.  *United States v. Salamanca*, 990 F.2d 629, 638 (D.C. Cir.),

*cert. denied*, 510 U.S. 928 (1993).

The presence of calm, peaceful, people who listen to police is

neither disruptive conduct nor membership in a mob.

## I. The Government and District Court Inclusion of First Amendment Conduct Before Going to the Capitol Grounds to Convict as a "Joining" Are Assaults on First Amendment Assembly

The government in closing argument states:

Ballenger testified she was following the group.  She was joining the group the mob. (A472).

The apparent reference to a situation at the rally either near the

Ellipse for Freedom Plaza but not at the Capitol or Grounds:

First a large group went I was in cuz we couldn't hear anything or see anything so we made a large group decision to start walking.  (A117)

The "mob" for the government is people who attended a rally and

walked peacefully down Constitution avenue. The "joining" for the

government is that the Prices walked along side people who attended a

rally before turning off to eat at the West Wing Café for 44 minutes.

Effectively, the government claims the First Amendment right to

peaceably assemble and walk down Constitution Avenue at a rally are

legal elements that transform peaceful walking and standing in the

small foyer at the Capitol into "disruptive conduct."  This is an incorrect

reading of the legal standard. Such a reading violates of the First

Amendment right to assembly and also exerts a chilling effect on that right.

The Court's Rule 29 Opinion doubles down on "joining" as being at the rally at the Ellipse noting the Prices:

> …expressly associated themselves with that group (Ballenger, for example testified that she and other rioters were "gathered together in support of the country," [Citing transcript A370-371], identified with its political cause (Ballenger carried a pro-Trump flag with her), and recorded the violence they observed. [Citing transcript at A372, A503-504] (A614)

The Ballenger testimony does not use the term "rioter" anywhere. A simple review of the transcript at the location identified by district court shows that the reference is to "gathered in support of the country" is   clearly a reference to the rally at the Ellipse.

## J. There Was No Evidence of a Dispersal Order Where Fair Notice by Announcement and Reasonable Opportunity Comply Is Required

Washington D.C. has a commitment to First Amendment activities and has experience reflected in the laws addressing such mass activities.  January 6, 2021 is not the first situation where a demonstration or rally in the District of Columbia had elements which the police engaged in intervention and arrests. D.C. Code § 5-331.03

(see Addendum) describes the policy regarding situations that "began" as a First Amendment assembly including situations where the metropolitan police department "determines that the assembly has transformed, insubstantial part or in whole, into an activity subject to dispersal or arrest". D.C. Code § 5-331.03 (2)(A). This situation further requires that the metropolitan police department issues an order to disperse as described in D.C. Code § 5-331.07(e) and (e-1). Such orders can apply to both First Amendment Assemblies and "… any other public assembly, riot, or part therof…" D.C. Code § 5-331.07(e).

Under D.C. Code § 5-331.07(e-1) such an order would have to meet certain important requirements of fair notice:

(e-1) An order to disperse shall:

(1) Be authorized by an official at the rank of Lieutenant or above;

(2) Inform the persons to be dispersed of the law, regulation, or policy that they have violated that serves as the basis for the order to disperse;

(3) Warn the persons to be dispersed that they may be arrested if they do not obey the dispersal order or abandon their illegal activity; and

(4) Identify reasonable exit paths for participants to use to leave the area that will be dispersed…..

There are no situations where fair notice through public announcement and reasonable opportunity to comply are not a fundamental part of the rules.

### K. Certain Interpretations from the *Alford* Appellate Opinion Do Not Properly Apply or Do Not Properly Apply in the Instant Case

The *Alford* appellate opinion spends much effort in advancing the "circumstances-sensitive approach" for interpreting the statutory terms "disorderly or disruptive conduct" in the context of §1752(a)(2) and § 5104(e)(2)(D). The opinion does so in service of allowing juries or judges to attain the most defendant-unfriendly interpretation of the statutory language possible.

The "circumstance sensitive approach" is not an established rule of statutory construction. Importantly, there is no generic January 6th "circumstance" since circumstances varied at different locations and times on January 6, 2021.  The courts may not create January 6th assumptions. The settings and circumstances come from evidence presented at trial and not assumptions borne form other times, locations, or trials.

Based on this review of a range of state case law covering a wide range of statutory language, the *Alford* appellate court claims the group of provisions are "nebulous but time has given them "concrete contours" in two "important ways" which are that 1) circumstances and settings matter and 2) even passive, quiet and non-violent conduct can be disorderly.  Logically, these points do not help provide "concrete contours" or make anything less "nebulous".

As an example of this, ultimately, defective analysis considers the review of dispersal laws. A standard rule of law is that a police officer may arrest a person for disobeying a lawful police order once a person is provided proper notice and an opportunity to comply. See discussion in *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977) with respect to move-on ordinance.  The Alford appellate opinion cites to *Cullinane* and culls only the element that peaceful conduct can be a violation.  The rule actual rule requires a predicate lawful order of the police which cannot be severed from the rule.  There is no valid legal analysis that severs passive resistance from the lawful order. Yet, the Appellate opinion then claims "passive" conduct or "presence" can be an ingredient in a different rule or category unrelated to lawful orders.

There is no basis for this dangerous, cut and paste formulation that has never been utilized before to glean statutory intent.

Separately, The *Alford* appellate opinion takes "disorderly or disruptive conduct" and severs the adjectives from the noun "conduct". The court then applies "disorderly or disruptive" to other nouns but avoids the tie of disorderly or disruptive to a defendant's specific conduct.

The *Alford* appellate opinion notes the lower court Alford ruling that "mere presence" met the standard and "his presence was an aspect of the disorder and disruption of the Capitol." Trial Transcript at 747:16–17, 748:8–9, *United States v. Alford*, No. 21-cr-0263.

Note there is no reference to "conduct" other than "presence" which is teamed with "<u>aspect</u> of the disorder and disruption of the Capitol." Emphasis added. The Alford appellate opinion appears to make similar claims in section C of the analysis stating a standard that:

> A rational jury could conclude that Alford's actions were disruptive because his presence in the Capitol contributed to the Congress's multi-hour delay… Id at 14.

Notice how the term "presence" is used and not disruptive conduct. The statutory standard is that defendants engage is disorderly or disruptive conduct as a necessary element. "Presence" that "contributes" is not a sufficient finding under the statutory text.

The *Alford* appellate opinion states:

> ….Each additional person, no matter how modestly behaved, increased the chaos within the building, the police's difficulty in restoring order and the likelihood of interference with the Congress's work.

Note how this statement renders the individual defendant's behavior into a nullity or relevant. Peacefully walking or standing is the conduct. Such conduct is not chaos.

In support of the circumstances sensitive approach, the *Alford* appellate opinion also misstates the relevance of a Supreme Court decision as supporting a rule of statutory interpretation:

> And the Supreme Court has taken the same approach, focusing its interpretation of a state's breach-of-the-peace provision on the defendants' conduct "in the circumstances of these cases." *See Garner* at 174.

In Section I of the opinion the *Garner* Court states it is "bound by the State's interpretation". *Id.* at 166.  In Section II of the opinion, and not

Section I, the Supreme Court reviews evidence and uses the term

"circumstances" in connection with the review of evidence. *Id.* At 172

and 174. *Garner* does not use "circumstances of these cases" to support

a different statutory interpretation.

Even assuming the circumstance sensitive approach to statutory

construction, there is no January 6th circumstance.  The circumstance is

based on evidence presented at trial about a specific time, location and

sets of conduct.

## L. In Its Rule 29 Opinion the District Court Added Further Inappropriate or Insufficient Argument Regarding Alleged Disruptive Conduct

The district court took umbrage with the Prices' emphasis of the

trial court statement of "being on the upper west terrace" which,

obviously, sound like a location and not conduct.  The district court

notes:

> In defying restrictions and remaining "on the upper west terrace"
> — in Ballenger's case, armed with bear spray and a pocket knife
> — including by stopping to "t[ake] a video of a woman banging on
> [a] window," blowing past deployments to clear the area, and then
> following the group that pushed through the Senate Wing Door,
> the two disrupted the certification of the electoral votes.  <u>See</u> Tr. II
> at 167–69.  Just as with the lookout above, their conduct might be
> innocent enough if they had acted alone, but that is not what
> occurred on January 6. (A606-607)

The Prices have already addressed the issue that the upper terrace was not a restricted area under § 1752(c) at the time the Prices were there. Regardless, "remaining" is a charge under § 1752(a)(1) and not disruptive conduct under § 1752(a)(2).

The accurate reference is that Cynthia Ballenger brought pepper spray, and not bear spray. There is no evidence presented at trial that it is illegal to carry pepper spray or a pocket-knife in D.C., and no evidence that Cynthia Price pulled either out or brought the pepper spray for other than protection. The Defense asked Special Agent Belcher whether there was anything illegal about taking pepper spray to Washington D.C. (A326). He said "I would have to ask the attorneys". Id. No evidence was presented. No other government witness commented on this topic. The Prices understands that a building security officer can ask anyone not to go further into a building for any reason.

40 U.S.C. § 5104(e)(1) has a provision prohibiting bringing a dangerous weapon. A dangerous weapon is defined in 40 U.S.C. § 5104(a)(2) in terms of a knife includes a dagger, a dirk, a stiletto, and a knife have a blade over three inches in length. Cynthia Ballenger was

not charged with carrying a dangerous weapon and there is no evidence her pocket-knife was over three inches. Congress provided no category for less than a dangerous weapon. There is no evidence her pocket-knife meets the definition of a dangerous weapon. The court in its opinion tries to insinuate this charge without basis and as a complete variance from the charging document.

The district court's claim that taking a video is disruptive conduct is without basis. Cynthia Ballenger did take 3 videos. So what? One included being near the window incident, although Cynthia started the video simply walking up the North Terrace. The video showing a woman banging on a window is a reference to Gov Exhibit 208 which is described as Open Source Video: 1610332654.7 showing Price at exterior window. See ECF 100 and (A294). Neither Cynthia nor Chris took this video.

The term "blowing past deployments" refers to walking by the external police cordon. Again, in American one can walk in front of a police line. There is no basis in text, case law, or logic, to call such walking disruptive conduct.

"Following" a group that pushed is a mischaracterization. There is

no evidence that the Prices observed that anyone pushed anyone.

People may have pushed before the Prices were there.

**IV.    The District Court Interpretation Of "Such Conduct, In Fact, Impeded or Disrupted" Under 18 USC 1752(a)(2) Is In Error and The Evidence Was Also Insufficient To Convict Under Count 2**

**A. Standard of Review**

The Prices are entitled to the same de novo standards of review

set out in Section II (A).

**B. "Such Conduct" Is Individual Disorderly or Disruptive Conduct of the Prices**

The text of 18 U.S.C. § 1752(a)(2) states, in part, that … "such

conduct, in fact, impedes or disrupts the orderly conduct of Government

business or official functions".  Count 2, thus, has both an *actus reus*

requirement and a causation/impact requirement. As discussed above in

Argument Section III, "such conduct" is a reference to the individual

disorderly or disruptive conduct of each defendant and the instant case

is brought against individuals.

## C. The Prices Could Not Impede or Disrupt the "Conduct" of Business That Was Already Suspended

In the instant case, the proceedings were initially disrupted before the Prices arrived. While the Prices were on the Capitol Grounds and in the Capitol there, there was no ongoing proceeding to impede or disrupt. The statute specifies the term "conduct" of business meaning something under way, not something suspended or something occurring in the future. "Conduct" of business functions or proceedings is in the present tense. As discussed above, before January 6th cases, there is no case where the term "disruptive conduct" was applied other than contemporaneously with the conduct of hearing or proceeding.

## D. The District Court's Legal Interpretation That Mere Presence Much Earlier in the Day Is, Per Se, a Sufficient Tie-In Regarding Delay to Proceedings Occurring Many Hours Later Is Error

Even if this Court accepts an interpretation where a future proceeding or the restart of a proceeding can be the basis for 18 U.S.C. § 1752(a)(2) that does not mean the government has met either the *actus reus* or impact test flowing from such conduct. Judge McFadden addresses the point this way:

Court: …The government also alleges that his conduct was disruptive in that it had stopped the congressional proceedings. I find that the proceedings had been halted well before he entered the Capitol building and that they did not resume until long after he had left… looking at his actions and the time at which they occurred, I find that the government has not proven beyond a reasonable doubt that he disrupted congressional proceedings. *Martin* [Martin ECF 41] at 270.

The important point is that Judge McFadden requires a finding of

evidence and reasonable doubt and not the automatic assumption that

mere presence proves the required connection to restarting at 8:06 or

9:02.

*Burrage v. United States*, 571 U.S. 204 (2014) states this point

about de minimis action and causation:

….By contrast, it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a non-essential contributing role in producing the event. *Id*. at 212.

The district court, on the other hand, states:

In this case, regardless of precisely when the proceedings were halted, the Court found that "Congress was not able to reconvene while the rioters," including Defendants, were in and around the Senate Wing. <u>See</u> Tr. II at 167; Tr. I at 48 (Captain Baboulis: "[A]ny individual could present a threat. We had no idea of who was there, what they were in possession of."). No more is required. Rule 29 Opinion at 12-13. (A609).

More is required. The statute does not speak to "threats" or presence. The statute speaks to the "disorderly or disruptive conduct" of the Prices as "such conduct."  Moreover, there was no residual threat, even if there was while the Prices were in the building.

Note, that in each of these statutory provisions on entering or remaining 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(a)-(c), the individual is present by entering or remaining but was not authorized. Effectively, the district court argues that the impact test of 18 U.S.C. § 1752(a)(2) needs no more proof than a person was trespassing, rendering the impact test a nullity

The proceeding did not restart until 8:06 in the Senate and 9:00 p.m. in the House. In the instant case, no effort was made by the government to tie the short walk of the Prices to the delay. Neither the government nor court contests that there were many more who exited after the Prices.

The Defense presented evidence that officers were standing around in great numbers at the same location at 4:15 p.m. (*See* Statement of Facts, Brief Picture 20 and Defense Exhibit 202 on

Appendix disk). The amount of time these officers stood around was unaffected by the Prices. The Prices, who were no longer there, had no effect on that subsequent police step or any other step at the Capitol in terms of any police resource or subsequent police action. In defense exhibit 201 (See Appendix disk) various citizens stick around talking to police officers. That delay was not on the Prices. When you are talking about a minute of walking, it is below mere speculation to claim a connection to an 8:06 pm and 9:02 start time.

### E. The District Court Analysis of *Burrage* Is Error And Proper Application Of *Burrage* Precludes Conviction Of The Prices Under Count 2

The district court relies on two January 6th cases and, principally, *United States v. Rivera*, 607 F. Supp. 3d 1 (D.D.C. 2022) which states "no language that would suggest but-for causation, such as 'results from' or 'because of'" Id. at 9 n.15; *cf. United States v. Rhine*, No. 21687, 2023 WL 2072450, at *6 (D.D.C. Feb. 17, 2023) ("[T]he presence of other sufficient causes of congressional disruption does not defeat liability under § 1752(a)[(2)].").  There are two responses to this.  First, the statutory language is well within the *Burrage* analysis of language resulting in but-for causation. Second, even if courts may use a hybrid

causation approach, no credible legal theory gets to the mere presence

theory as a basis for the "in fact" clause.

Simply, "such conduct" is a clear reference to the individual conduct

of Cynthia Ballenger or Christopher Price and no one else.   Such

conduct of the Prices has to actually be the cause.

The Court in *Burrage* reviewed other language such as

"because of", "based on", "by reason of", "results in" and other

phrases – all with the result of applying a but-for analysis.  *Id* at

213-214.

"In fact" is extraordinarily similar to "in fact" causes. The term

"such conduct" is tied to "in fact" and then tied to two particular

results—"impedes" or "disrupts". "In fact" and "results from" are

similar terms. The Supreme Court in *Burrage* noted that: "Results

from" imposes, in other words, a requirement of actual causality. *Id*

at 211. "In fact" certainly means in actuality.

*Burrage* continues:

The Model Penal Code reflects this traditional understanding; it
states that "[c]onduct is the cause of a result" if "it is an
antecedent but for which the result in question would not have
occurred." [Citation omitted]. That formulation represents "*the
minimum* requirement for a finding of causation when a crime is
defined in terms of conduct causing a particular result." *Id.*,

Explanatory Note (emphasis added); see also *United States* v. *Hatfield*, 591 F. 3d 945, 948 (CA7 2010) (but for "is the minimum concept of cause"); *Callahan* v. *Cardinal Glennon Hospital*, 863 S.W. 2d 852, 862 (Mo. 1993) (same). *Id* at 211.

*Burrage* states: "[t]his but-for requirement is part of the common understanding of cause." Id.

*Burrage* also describes other hybrid or alternative theories of standards by reviewing case law and a legal treatise but concludes:

....the authors of that treatise acknowledge that, even in the tort context, "[e]xcept in the classes of cases indicated" (an apparent reference to the situation where each of two causes is independently effective) "no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it." *Id.,* at 268.

The district court then claims a Supreme Court case supports the district court's interpretation of judicial authority:

The actual-causation gloss <u>Burrage</u> calls for need not apply where, as in this case, "[t]he open-endedness of the statutory language allows" the "adoption of a demanding but still practicable causal standard." <u>Maslenjak v. United States</u>, 582 U.S. 335, 351 (2017). (A610).

*Maslenjak* is a case where the Supreme Court adopts a narrowing construction that favors criminal defendants and protects legal immigration status. *Maslenjak* offers no support for constructs that are unfriendly to criminal defendants, to broaden the universe of criminal

liability, or to provide courts discretion to broaden the universe of criminal liability. *Burrage* and *Maslenjak* are two Supreme Court cases that side for a higher causation standard not a lower standard. Moreover, 1752(a)(2) is not open ended. It says "such causation, in fact…" creates the result.

## V.      The District Court's Legal Interpretation of the *Actus Reus* For 40 U.S.C. § 5104(e)(2)(G) Are in Error and There is Insufficient Evidence to Convict

### A.      Standard of Review

The Prices are entitled to the same de novo standards of review set out in Section II (A).

### B. The District Court Improperly Adopted the "Joined the Mob" Theory for Count 4

The government stated a similar "joined the mob" argument as the basis for Count 4 as it did for Counts 2-3:

> The Court: Isn't that your best argument, that the activities they took inside the building, if they had been by themselves, would you agree, likely would not satisfy the demonstrate prong since it seems like they were largely peacefully walking, standing, texting, or taking pictures? (A475)

> Ms. Akers:  ….And so I take your Honor's point that it might be different under this particular statute if this weren't January 6 and the defendant's didn't intentionally join a mob and they didn't enter into the building with a group of people intentionally, but

they did.  And our argument here is that that conduct is sufficient to establish this element. (A476)

For Count 4 the lower court, in part, states:

> But again, as being part of a demonstration, in fact, I can't think of a larger demonstration that has occurred than the one that occurred in the Capitol by the rioters on January 6, that they are—that what this was, to put it mildly, was a mass demonstration, to put it more accurately probably it was an insurrection, but their knowingly being part of this demonstration by <u>being in the building as part of this group</u> means they violated Count 4…. (emphasis added) (A508)

Again, the district court claims the *actus reus* for Count 4 is "being in the building as part of this group".  The court identified no other independent, demonstrative or disruptive conduct on the part of the Prices.

The district court statement does reflect a violation of Fed. R. of Evidence 201 and the Fifth and Sixth Amendment by going outside the evidence at trial. The primary evidence at trial inside the Capitol building is government video evidence of people entering and leaving the small foyer at a certain time.  There is no evidence at trial that this is the largest demonstration in the capitol or any evidence about the building other than the small foyer. Evidence from the trial indicates a small number of people

start chanting "fight for Trump" inside the foyer while the Prices were standing in line to exit.  The Prices did not join in this chanting and the chanting was not occurring when the Prices entered.

### C. The District Court Fails to Acknowledge First Amendment Rights Outside the Capitol, the Statutory Limitation to Conduct Inside the Capitol, And the Limitation to Consider Evidence from the Trial

The Prices have First Amendment Rights to attend the rally at the ellipse, to wave a flag, and to walk in Washington D.C. with others from the rally. The Rule 29 Opinion specifically relies on the Price's presence at the rally as evidence to support conviction under § 5104(e)(2)(G). People frequently attend demonstrations outside of Capitol Buildings and then go into Capitol Buildings later.  The district court violates the Prices' First Amendment Rights and a failure to understand the reach of § 5104(e)(2)(G).

The district court also claims that the Prices (meaning only Cynthia Ballenger) recorded violence as part of its evidence for violation of § 5104(e)(2)(G). As discussed above, someone else recorded the specific video of a woman banging on a window.

Regardless, the window incident is outside the Capitol building and has no bearing on demonstrating in the Capitol. Fourth, the reading that recording a video is demonstrative conduct even inside the Capitol is not supported by the statutory text. Moreover, as discussed below, the argument that interaction with social media while in the Capitol, which did not occur in the instant case, shows that the provision is facially a violation of the First and Fifth Amendments.

### D. The Prices Did Not Engage Demonstrative Conduct or Demonstrative Conduct That Is Disruptive and No Conduct Was "Organized"

As a statutory limitation, the district court fails to find the Prices engaged in demonstrative conduct inside the Capitol. The video is clear. The Prices say and do nothing that could constitute demonstrative expression. The district court further fails to apply and satisfy the Constitutional limitation from *Bynum v. U.S. Capitol Police Bd.,* 93 F. Supp. 2d 50 (D.D.C. 2000), in that there is no demonstrative conduct which is also disruptive conduct.

The district court fails to adopt and address its own limitation that the district court adopts from *Nassif* that the Prices are part of an "organized" demonstration while going into the foyer.

> The statute specifically prohibits "taking part in an organized demonstration or parade that advocates a particular viewpoint." Order at 2 [quoting *Nassif*]. (A52)

Since the district court was, in part, relying on *Nassif*, the Prices offered that the construct that a demonstration was "organized" to be in the Capitol should be a required element. The district court rejected the Prices addition. The district court cannot tie the short walk in a foyer by the Prices as a walk that was "organized". The Prices took part in no organization and there is no one to point to as an "organizer". As discussed above, the district court's "joined the mob" legal interpretations are illegal and unsupported.

The Court found there was no plan to enter prior to being on the upper terrace:

> And I agree with you that there is no evidence of a plan to enter the building at the moment they entered the restricted grounds. (A491-492).

The alleged organization – which under § 5104(e)(2)(G) must be about demonstrating IN the Capitol—and is nowhere established.

**VI.    There Is Insufficient Evidence to Meet the *Mens Rea* Test for Counts 1, 2, 3 & 4.**

### A.  Standard of Review

The Prices are entitled to the same de novo standards of review set out in Section II (A).

### B. There is Insufficient Evidence for the *Mens Rea* Test for Count 1, 2, 3, & 4

It is important that the *mens rea* of each defendant must be assessed separately and evidence pertaining to one does not pertain to the other.

With respect to Count 1, the Prices have discussed above that there is no material evidence of a restricted area on the areas they walked and nothing providing a demarcation.  There is no evidence a protectee was going to be on the grounds are anywhere near where they walked.  There is no evidence the Prices had knowledge a protectee was going to be on the grounds or near the areas they walked in the building.  Such knowledge is required for conviction.

The Prices have two broad understandings that most American's share.  First, police will tell them if there is a problem.  American's rely on police and don't expect police will provide no warning of a restriction at an open door with dozens of people peacefully walking and walking out. Second, in America and in public building, getting in a door does not mean you are going further.  Security can tell you its wrong entrance or it is not open at that time.  Security can tell, as they did here, that you cannot go past the foyer.  None of the actions of the Prices indicate intention to disrupt. They did nothing to say anything to anyone in the building that is political.  They were always police – the most non-disruptive conduct.  The Prices did not willfully understand such peaceful conduct to be a violation.  And it is not.  The Prices are not aware the many judicial theories of the courts.

With respect to the 1 minute walk in front of dozens of policemen, the question under Count 2 is whether that walk was done with (a) knowing there was a restricted area nearby, (b) knowing the walk is disruptive conduct, and (c) done with intent to disrupt Congressional proceedings that would occur much later.

With respect to Counts 3 and 4 the standard includes the term "willfully".  A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.  *See United States v. Bryan*, 524 U.S. 184, 190 (1998). As stated in Bryan,  "…In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." [citing *Ratzlaf* v. *United States*, 510 U.S. 135, 137) (1994).] *Id.*  at 192.

*United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019) states that: …..willfulness requires that the defendant "acted with knowledge that his conduct was unlawful." [citing  *Bryan*]. The conduct that he must know was unlawful is the *actus reus* of the crime with which he is charged. *Id.* at 693.

The conduct matters here. It was a peaceful walk with many policemen right there.  The policemen were not challenged at the time and no one was pushing.  The courts recounting observations of disruption regarding other people or locations have nothing to do with the *actus*

*reus* of the Prices.  The issue is not whether the Prices were sufficiently observant.  The *mens rea* must be about their conduct. The conduct is walking and standing and never disobeying an officer.  Moreover, with respect to the "joined" the "mob" element, there insufficient evidence to support either claim nor evidence that the Prices believed that either beyond a reasonable doubt.

The Prices have no reason to believe they paraded, which a specific construct.  With respect to demonstrating in the Capitol, the Prices engaged in no demonstrative conduct and had no reason to believe entry and their initial walk was demonstrating.

## VII.    18 U.S.C. § 5104(e)(2)(G) is Facially Unconstitutional

### A.    Standard of Review

This Court reviews purely legal questions *de novo*. *United States v. Fischer*, 64 F.4th 329, 335 (D.C. Cir. 2023); *United States v. Verussio*, 762 F.3d 1, 13 (D.C. Cir. 2014). Thus, constitutional challenges are reviewed *de novo*. *United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999).

## B. 40 U.S.C. § 5104(e)(2)(G) Involve First and Fifth Amendment Concerns

*Bynum* overturned regulations purporting to interpret 40 U.S.C. § 5104(e)(2)(G) on Constitutional grounds. With respect to the First Amendment the *Bynum* Court states:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive…*Id*. at 57 (Citations omitted)

The *Bynum* Court makes a similar argument with regarding Vagueness. *Id.* at 58.

The Prices agree with at least the Constitutional limitations as stated in *Bynum*. The Prices contest the public forum/non-public forum distinction for certain areas of the Capitol Buildings.  Significantly, the Prices argue several points based on substantial developments since *Bynum*. The first substantial set of development is the advent of smartphones and social media.  The second set of substantial developments is numerous January 6th rulings that violate the Constitution and prove vagueness, overbreadth, and the basic points made by the Prices that the provision is not sustainable.

## C. Parts of the Capitol Building Should Be Public Forum and Parts Non-Public Forum

The degree of First Amendment scrutiny accorded to governmental decisions limiting speech on public property depends on whether the property in question is (1) a traditional public forum, (2) a government-designated public forum, or (3) a non-public forum. *See Perry Education Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45 (1983). Restrictions on speech in either category of public forum must be "reasonable time, place, and manner regulations" that are "content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication." *Id*. Speech restrictions in non-public forums, on the other hand, are permissible "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Defense Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

In *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972), the court states:

> The Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public; indeed, thousands of people visit them each year.

The Prices argue that the higher standards of the public forum analysis should apply to the hallways, foyers, and other public areas of the Capitol Buildings. Regardless, as discussed below, 40 U.S.C. § 5104(e)(2)(G) does not meet the lower "reasonableness" standard regardless.

### D. 40 U.S.C. § 5104(e)(2)(G) Is Unreasonable Under the Non-Public Forum Analysis and Not Narrowly Tailored Under the Public Form Analysis; The Provision Needlessly Punishes First Amendment Conduct Solely Because It Is First Amendment Conduct

40 USC § 5104(e)(2)(G) criminalizes conduct constituting First Amendment modes of expression EXPRESSLY and BECAUSE such conduct is a First Amendment mode of expression. The proper and reasonable route is to regulate using crowd management terms not First Amendment modes of expression terms. The Prices are not arguing the First Amendment trumps or can constitute an exception to crowd management rule in the Capitol. The Prices specifically note that 40 USC § 5104(e)(2)(A)-(F) or other rules of crown management

accomplish the Congressional purposes and do not specifically and fully ban three First Amendment modes of expression.  [ECF 55-1 at 13].

*Lederman v. U.S.*, 291 F.3d 36 (D.C. Cir. 2002) reviews a First Amendment challenge to a regulatory prohibition on demonstration activities outside Capitol building. As stated in *Lederman*,

> We hold only that, as currently written, the demonstration ban imposes "a serious loss to speech . . . for a disproportionately small governmental gain," *Citing  White House Vigil for the ERA Comm. v. Clark,* 746 F.2d 1518, 1544 (D.C. Cir. 1984)(Wald, J. concurring in the judgement in part and dissenting in part on other grounds). *Lederman* at 46.

As this Court and other circuits have held, "'reasonableness' requires something more than the toothless 'rational basis' test used to review the typical exercise of a state's police power." *Price v. Garland*, 45 F.4th 1059, 1072 (D.C. Cir. 2022), *cert. denied*, No. 22-665, 2023 WL 3158363 (U.S. May 1, 2023). "[I]t isn't enough simply to establish that the regulation is rationally related to a legitimate governmental objective." *Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993).

 "Reasonable" is about the trade-offs between the reasons for restricting First Amendment activity and the loss from 1) restricting

First Amendment Activities, 2) overbreadth under the First Amendment, 3) overbreadth problems under the Fifth, 4) Vagueness and Fair Notice issues under the Fifth Amendment, 5) selective enforcement issues under the Fifth Amendment. [Docs 67 at 6-7].



**Brief Pictures 34 & 36 from Defense Motion to Reconsider Second Motion to Dismiss (Facial Challenge) (See A35, 44, 45)**

### E. Certain District Courts Have Improperly Included Fundamental Additional Areas of First Amendment Speech Including Communication on Social Media from Inside or Even Outside the Capitol Buildings

The *Rivera* opinion shows the immediacy and importance of the issues the Prices raise in the facial challenge. The opinion states:

> Defendant primarily argues that because he was "recording" as a "videographer," he was not "parading or "demonstrating." The two, however, are not mutually exclusive. In truth, Defendant acted more as a social media influencer might, frequently urging his followers to "share, share, share."[citation omitted]… Indeed, just before he joined the crowd, he was primarily concerned that

no one appeared to be watching his Facebook Live [citation omitted] *Rivera* at 15.

Camera's, smart phones and recording are all allowed in the Capitol Buildings in most places. The *Rivera* discussion is clearly about First Amendment protected speech on social media. That is a fundamentally large amount of First Amendment speech needlessly prohibited or construed as an adverse legal element by a district court. Social medial communication has no disruptive effect and is a substantial means of First Amendment activity in Capitol Buildings. People use phones for many reasons and they have every right to communicate broadly while in the Capitol building if the communication is quiet.

## VIII.    The Prices' Convictions on Counts 1-4 Should Be Vacated Because the Superseding Information for Each Defendant-Appellant Failed to Allege Essential Facts and The Nature of the Accusation

### A. Standard of Review

The legal sufficiency of the Superseding Information for each Defendant-Appellant is a question of law and reviewed de novo. *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014); *United States v. Yakou,* 428 F.3d 241, 246 (D.C.Cir.2005). *United States v Lawrence, 727 F.3d 386, 397* (5th Cir. 2013).

**B. The Bare Recitation of Certain Statutory Language, the Date and General Location Fails the Legal Standards in the Instant Case**

The superseding information merely recites certain statutory language. In the instant case, that approach does not satisfy the Fifth or Sixth amendment or Federal Rule of Criminal Procedure 7(c) or 12(b)(3)(B)(iii).

Both appellants and the lower court cite to *Hamling v. United States*, 418 U.S. 87, 117 (1974). The district court highlights:

> It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." Hamling, 418. at 117 (quoting *United States v Carll*, 105 U.S. 611, 612 (1882))

The district court is wrong on two fronts. First, the superseding information does not meet the standard just presented. Second, the lower court leaves out a critical, defendant-friendly part of the *Hamling* opinion which states:

> "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with

> such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Citing *United States* v. *Hess*, 124 U.S. 483, 487 (1888). *Hamling* at 117-119.

See also Fed. R. Crim. Proc. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged...") (emphasis added).

*Carll* supports the Price's position. *Carll* dismisses an indictment for being insufficient. Id. at 613-614. *Carll* also states:

> ....the fact that the statute in question, read in the light of the common law, and of other statutes on the like matter, enables the court to infer the intent of the legislature, does not dispense with the necessity of alleging in the indictment all the facts necessary to bring the case within that intent. *Id*. at at 612-613 (citations omitted).

Defendants memorandum cites *Hunter v. District of Columbia* , 47 App. D.C. 406 (D.C. Cir. 1918), where the D.C. Circuit Court found that beyond the general terms of acts prohibited by the statute, there was no averment of fact "to inform defendants of the nature of the acts which [were] relied upon by the prosecution as constituting alleged obstruction of the sidewalk, or that would enable defendants to make an intelligent defense, much less to advise the court of the sufficiency of the charge in law to support a conviction." *Id*. at 410. And the fact that the charging

document "fail[ed] to set out the acts committed by the defendants which constituted the crowding and obstructing of the free use of the walk by them[,]" *Id.* at 409, was a fatal flaw. *Hunter* reversed and remanded with direction to dismiss the information.

Defendants memorandum also notes *United States v. Nance*, 533 F.2d 699, 701-703 (D.C. Cir. 1976) (reversing where the indictment failed to make necessary factual allegations as to what were the false representations). *Nance* cites to 7 or more Supreme Court cases stating there must be such a statement of facts and circumstances as will inform the accused of the specific offence, coming under the general description with which a defendant is charged. *Id.* at 702. See also *Nance* at 710-- A bill of particulars will not cure a fatally defective indictment. *Russell v. United States,* 369 U.S. 749, 770-71 (1962).

No facts or descriptions were discussed in the superseding information (nor the trial for that matter) about what were the essential facts of "joining" or "mob" or anything else.

The Defense was denied the ability to request discovery on these issues, to look for witnesses concerning these issues, to make presentation during trial on these issues, to consider whether to pursue

a bench or jury trial based on this different and novel legal argument, and to offer proper motions to address what would later become the prime argument of the government and district court.

**IX.    The Prices' Convictions on Counts 1-4 Should Be Vacated Since Evidence Garnered or Derived from The Illegal Search Warrant and Search Warrant Operation for Facebook Was Important to Conviction and To Ensure Future Conduct Does Not Fail Fourth Amendment Protections**

**A. Standard of Review**

"In reviewing the district court's denial of the suppression motion, The D.C. Circuit reviews legal conclusions de novo and factual findings for clear error." *United States v. Miller*, 799 F.3d 1097, 1101 (D.C. Cir. 2015).  The argument is preserved in Motion to Suppress [ECF 82-2]; Defendants Reply [ECF 86]; Rule 29 Motion [108-1].

**B. The Search Warrant and Search Warrant Process Was A Sham and Unreasonable Under the Fourth Amendment**

It is imperative we look at an element of the Government Procedure for warrant execution in the search warrant for Facebook Messenger service in the instant case. See ECF 85-1 at 11 and ECF 82-3 at 11.  The Search Warrant in Attachment B has a section III called Government Procedures for Warrant Execution which states:

The United States Government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope to be seized specified in Section II.  That information that is <u>within the scope</u> of Section II <u>may be copied and retained by the United States</u>.  Law enforcement personnel will then <u>seal</u> any information from the PROVIDER that does not fall within the scope of Section II and <u>will not further review the information absent an order of the Court</u>. (Emphasis added).

Gov't Exhibits 308A, 308B, and 309A show the search warrant or search warrant operation was a sham because these are the data dumps that were supposed to be sealed. As an example, Gov't Exhibit 308(B) is 14,673 pages.  It is, basically, a complete data dump from Facebook regarding Cynthia Price's messenger service with Facebook. Gov't

Law enforcement personnel obviously did not seal any of the information and provided all information to the prosecution. That is a clear violation of the search warrant and there is no possible claim of compliance.  It is, in addition, the prosecution obviously searched and reviewed the full 14,637 pages of Government Exhibit 308(B) without a warrant allowing such search. The prosecution did so absent an order of the Court authorizing the material that was supposed to be sealed and not further reviewed by law enforcement, let alone the prosecution.

The Prices specifically articulated this problem in the

memorandum in support of the motion to suppress:

> The Search Warrant has the government administer these ambiguous filters through government employees who are likely simply on the prosecution team…. This leaves broad discretion both respecting as to who administers the various filtering criteria above AND interpretations of those filters, and interpretations of the statutory elements. (A69)

Defendants further asked for any other appropriate relief which can

include declaratory action or calling for a hearing under the courts

oversight power and obligations over search warrants.  [Doc 86 at 8].

The district court erred by rejecting these arguments both in the motion

to suppress, the reply, and after further, full proof of the sham in the

Rule 29 and Rule 33 motions. (A542-543, A554, A560-A563).

The motion to suppress also argued that the filtering questions

failed the Constitution. The Court in its cursory analysis, stated at or

just before the trial, in part states:

> Second, I believe the warrant for Fourth Amendment purposes was sufficiently particular.  There was clearly probable cause to believe the defendants committed crimes on January 6, and it was reasonable to believe that Facebook would have evidence of those crimes given to show their intent in coming to the Capitol that day. TR 1 at 6.

The district court's two sentences here are not viable answers to the overbreadth and particularity arguments in the motion to suppress. It is insufficient to simply say there is probable cause for information somewhere in the full data dump.

Courts around the country have recognized that "the particularity requirement assumes even greater importance" in electronic searches because otherwise there is "a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *United States v. Galpin*, 720 F.3d 436, 446–47 (2d Cir. 2013) (quoting *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010)).

### C. Failure to Follow the Scope Limitations in the Authorizing Statute Is Relevant Part of an Unreasonableness Analysis under the Fourth Amendment

The Search Warrant Affidavit cites the Stored Services Act (SCA) as the source of authority but the warrant and government fail to comply with the 180-day limitation in the SCA. 18 U.S.C. § 2703(a) has a time limit of 180-days back from the date of the warrant. So, even if other scope limitations did not apply, 18 U.S.C. § 2703(a) would cover a

period something like May 7, 2022 to November 7, 2022 which would

eliminate everything in Gov exhibits 300, 301, 302, 306, and 307.

The Court states:

> And if it didn't comply, the remedy is not exclusion because that's only a Fourth Amendment remedy, and there's no exclusionary remedy in the act…. (A156).

The Prices did not ask for a remedy for a simple violation of the SCA.

The Prices argued and have shown the search warrant and search

warrant operation are unreasonable searches under the Fourth

Amendment for multiple and cumulative reasons which includes that

the search warrant failed the scope limitations of the alleged authority

for the warrant and that the search warrant operation is a sham. *See*

18 U.S.C. § 2708 ("The [damages] remedies and sanctions described in

this chapter are the only judicial remedies and sanctions for <u>non-

constitutional violations</u> of this chapter.")(emphasis added).

## D. The *Leon* Good Faith Exception Does Not Apply

As stated in *United States v. Leon*, 468 U.S. 897 (1984) regarding

the exclusionary rule:

> The rule …operates as a "judicially created remedy to safeguard
> Fourth Amendment rights generally through its deterrent effect,
> rather than a personal constitutional right of the party
> aggrieved."[citation omitted]. Id. At 906.

*Leon* creates a good faith exception where police officers operate in

good faith to implement a search warrant even if the probable cause

determination by the magistrate was later found as error.  The *Leon*

Good Faith exception does not apply here.

First, the *Leon* good-faith exception was not intended to apply

beyond the probable cause determination.  Second, the Leon good-faith

exception does not apply to clear violation of the terms of the search

warrant that the government had proposed and assured it would follow.

Third, the exception does not apply to the actions of the prosecution in

violating the terms of the search warrant.  Fourth, the prosecution

extended the misconduct based on the search warrant, and also by, as

discussed below, surprising the defense through the tactic of searching

the 14, 637-page data dump, mischaracterizing a message, and failing

to identify the exculpatory parts on the same page.

The relevant Fourth Amendment point here is the government

will modify its approach, in part, based on the application of the

exclusionary rule, and the downsides related to exclusion in the instant

case are limited. The costs of suppression are minimal here. This is not a case where a dangerous defendant is being set free. *See Herring v. United States,* 555 U.S. 135, 144 (2009) ("The principal cost of applying the [exclusionary] rule is, of course, letting [a] guilty and possibly dangerous defendant[ ] go free.").

The exclusionary rule applies to all materials from the sham Search Warrant and sham search warrant operation. That full exclusionary rule applies to the full set of Facebook returns including Government Exhibits 306, 307 and 308B. The transcript record, exhibits, and evidence is replete with evidence from the sham search warrant operation. Government video exhibits 300, 301, and 302 are listed as from the Facebook search. References to Facebook evidence is at least A266 -271, A290-293, A310-317, A322, A324, A327-329, A340-344, A357, A402-403, A408-411, A415-420, A424-428, A432-A434, A447, A448-449, and A457-458. The Prices only peacefully walked. They walked for a minute and then stood in line to exit for 5 ½ minutes. With no *actus reus*, the government and district court spent all their time on Facebook or casual conversations. However, that is the entire

government case. The Prices are correct about both suppression and the impact in the case.

### E. The Prosecution Added to the Misbehavior During Trial and After

The prosecution asks FBI Special Agent if he pulled what he thought was relevant, suggesting Exhibit 306 and 307 consistent with other items to be in the broader basket that would not be used. (A266) The government later questioned Cynthia Ballenger from part of a Facebook message among the 14,637 pages not in Exhibits 306 or 307. The government portrayed Cynthia Price as sympathetic to a set of Lin Wood statements that included the term "execute" Mike Pence. (A415). These were not public postings by Cynthia, but messages of Cynthia Price were sent privately to the friend and the messages show the exact opposite of what the Government got away with at trial. Specifically, in the prior post Cynthia Price states: "….sounds like Lin Wood is completely lost it." (A118). In the specific message, Cynthia says "….not sure why he would be doing that to ruin his credibility." *Id*. At trial, government counsel omitted the language that clearly indicates Cynthia Price disagreed with him. (A415-416). Defense counsel objected at trial to the questions, saying the defense did not have the article. (A417) but

the district court overruled.  The government sentencing memoranda [Doc 133 at 9] further falsely presents the "article about executing Mike Pence" as a truthfulness issue when it was the government knowingly presenting false and misleading evidence.

These games by the prosecution violate the Fifth and Sixth Amendment and are available based on Fourth Amendment violation. The behavior will continue if courts, like the district court below, ignores it.  Cynthia Ballenger had a right to testify free from false allegations and the fruits of a sham search warrant operation.

## X.    The District Court Failed to Make Necessary Findings in the Process of Sentencing

### A. Standard of Review

This Court "review[s] *de novo* the district court's interpretation of the Sentencing Guidelines in calculating a defendant's Sentencing Guidelines range." *United States v. Brown*, 892 F.3d 385, 401 (D.C. Cir. 2018).

### B. The Court Did Not Make the Proper and Necessary Findings for the Guideline Ranges in the Presentencing Report

A court must correctly determine the applicable guideline range at the outset of sentencing. As the Court summarized in *Molina-Martinez v. United States*, 578 U.S. 189, 198-199 (2016) (holding that defendant who shows the district court mistakenly started with an incorrect higher guideline range has met the reasonable probability of a different outcome absent the error required to establish plain error).

> "Even if the sentencing judge sees a reason to vary from the Guidelines, 'if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, *then the Guidelines are in a real sense the basis for the sentence*.'" [citation omitted].

*See also United States v. Turner*, 21 F.4th 862 (D.C. Cir. 2022) (incorrect guidelines calculation requires remand for resentencing).

In the instant case, the district court adopts the findings of the presentence reports in the face of the Prices' objections. The court does provide a variance and explains it assumes a conceptual 0 to 6 month range from which the district makes it further made its determination. The lower range is favorable as a variance. However, adopting the presentence report guidelines assessments is incorrect and the court should consider the objections which went to various factual assumptions about conduct. The Prices are also concerned that if there

are other reasons for remand, that the Prices initial objections are preserved.

### 1. The Base Offense Level Should Be 6 Points and Based on USSG §2B2.3 And Not USSG §2A2.4

"To arrive at a Guidelines sentence, a district court must first determine the offense guideline section from Chapter Two applicable to the offense of conviction, and it must do so by referring to the Statutory Index." *United States v. Flores*, 912 F.3d 613, 621 (D.C. Cir. 2019) (citing USSG §§ 1B1.1(a)(1), 1B1.2(a)). The Prices were convicted under 18 U.S.C. § 1752(a)(2) for the offense conduct of entering a restricted building and engaging in disorderly and disruptive conduct therein that impeded government business and official functions. Rather than applying USSG § 2B2.3 (Trespass) to this count of conviction, the district court erroneously applied USSG § 2A2.4 (Obstructing or Impeding of Officers), notwithstanding that the indictment included no allegation that the Prices had any adverse interaction with a law enforcement officers. The erroneous application of § 2A2.4 resulted in a higher recommended Guidelines range than was applicable and requires remand for resentencing.

Importantly, "[i]n the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute." *Id.* § 1B1.2 cmt. n.1. In such a case, "the court will determine which of the referenced guideline sections is most appropriate *for the offense conduct charged in the count of which the defendant was convicted.*" *Id.* (emphasis added).

In *United States v. Brodnax*, Judge Friedman ruled that § 2B2.3 was the appropriate guideline for a conviction under § 1752(a)(2), and not § 2A2.4. *See* Order, *United States v. Brodnax*, Case No.: 1:21-cr-350, Doc. 61 (Aug. 18. 2022). Judge Friedman in *Brodnax* adopted the interpretation that 18 U.S.C. 1752 has in subpart A, five subsections, any of which can be charged as a criminal offense depending on the facts and circumstances. Id at 91: 16-18. *Brodnax* notes:

> [The Defense counsel] stated §2A2.4 requires some sort of action against a government official, and among other things, she points to application note 2 to §2A2.4 which says the base offense level incorporates the fact that the victim was a governmental officer performing official duties. … He had no physical contact with any

officer.  He didn't even yell at an officer so far as the evidence

shows, and therefore, it's more like trespass. Id at 98: 4-9…

….I conclude that the appropriate guideline for a violation of

1752(A)(2) is 2B2.3, trespass.  Id. at 94:7-13.

In the instant case, as discussed in greater length above the district

court, in error, lowered what is "disruptive conduct" to be as little as

presence in the Capitol with others, without more individual conduct,

which is the same as trespass.

### 2. The District Court Did Not Make the Requisite Findings for a 2-level enhancement under USSG § 3C1.1 For Cynthia Ballenger

While the United States Supreme Court has recognized that a

trial court is within its discretion to enhance a defendant's sentence

under USSG § 3C1.1 when a defendant testifies and is nevertheless

convicted, the Court was careful to note that such an enhancement is

only appropriate when there is false testimony given with a "willful

intent to provide false testimony." *United States v. Dunnigan*, 507 U.S.

87, 94–95 (1993). The Supreme Court stated: "[I]f a defendant objects to

a sentence enhancement resulting from her trial testimony, a district

court must review the evidence and make independent findings

necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." 113 S. Ct at 1117. To secure that right, the Court held, if an accused challenges a § 3C1.1 sentencing enhancement based on the accused's testimony at trial, the district court must make factual findings that satisfy all three elements of perjury — falsity, materiality, and willfulness — contained in 18 U.S.C. Section 1621. *Id.* at 96-97, 113 S. Ct. 1111. The district court did not make these findings and should not have adopted the presentence report over the objections of the defense. The district court allowed limited conversation on this at the hearing.  The district court stated:

> I am not going to revisit my findings at trial.  I believe my findings at trial were correct regarding characterization of the testimony…(A665)

The court further stated "again, Mr. Kenkeremath, I do not want to hear further argument about 3C1.1 period" (A666).  The requisite findings were not made. The district court never announces a finding on USSG § 3C1.1 but nonetheless adopted the sentencing without change the recommendations from the United States Parole Officer that included the enhancement.

**C. The District Court Failed to Comply with The Requirement to Rule on Disputed Portions of the Presentence Report**

Under Fed. R. Crim. P. 32 (i)(3)(B) the district court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Both Cynthia Ballenger and Christopher Price, the defendants had very specific objections to the statement of offense conduct in the two presentence reports which were listed out in a specific document articulated in the record at A618, [ECF 131-2]  Defendants' Additional Objections to Presentence Investigation Report and Recommendations with Reference to Sections of the Main Memoranda in Aid of Sentencing. The presentencing reports are at [Docs 121, 122, 123, and 124].  These issues were not addressed.

## CONCLUSION

For the forgoing reasons, the Prices respectfully request that this Court:

1) Vacate Counts 1-4 because the district court's legal interpretations are in error and there is insufficient evidence for conviction based on *actus reus*, *mens rea* for all Counts or the impact test for Count 2;

2) Find 40 U.S.C. § 5104(e)(2)(G) is facially unconstitutional and vacate conviction of Count 4 on this basis;

3) Find the district court erred by dismissing the Motion to Dismiss Regarding Particularity and Allegations of Essential Facts and Vacate Counts 1-4 on this basis;

4) Find the district court erred in dismissing the Prices Motion to Suppress and the Rule 29 and Rule 33 motions regarding the Facebook search warrant and search warrant operation and vacate Counts 1-4 because evidence from the search warrant or derived from the search warrant had substantial negative impacts in the instant case on conviction under these counts.

5) Find the district court erred in assessing the sentencing guidelines and failing to address the Price's objection to the presentencing reports regarding offense conduct and remand requiring proper determinations and rulings.

Respectfully submitted,

NANDAN KENKEREMATH

_____--/s/_____

NANDAN KENKEREMATH
Counsel for Defendant
2707 Fairview Court
Alexandria, VA 22311
(703) 407-9407

## CERTIFICATE OF LENGTH

I hereby certify, pursuant to Federal Rule of Appellate

Procedure 32(a), that the foregoing Opening Brief for Appellant was

prepared in a proportionately spaced 14-point serif font, and

contains 19,512 countable words.

_____--/s/_____

NANDAN KENKEREMATH
Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

I CERTIFY that on this 6th day of February 2024, a copy of the

Appellants' Brief (with addendum) was filed via this Court's electronic

filing system and was thereby on Assistant United States Attorney

Elizabeth H. Danello, Deputy Chief, Appellate Division, Office of the

United States Attorney for the District of Columbia, 555 Fourth Street,

N.W., Room 8106, Washington D.C. 20530 (email address:

elizabeth.danello @ usdoj.gov.) and on Chrisellen Kolb Chief of the

Appellate Division (email address: Chrisellen.R.Kolb@usdoj.gov).


_____--/s/_____

NANDAN KENKEREMATH
Counsel for Defendants-Appellants

# ADDENDUM

## Addendum Table of Contents

18 U.S.C. § 1752 (a)(1) and (2) and (c) ..............................................110

40 U.S.C § 5104.......................................................................111

D.C. Code § 5–331.03..............................................................114

D.C. Code § 5–331.07..............................................................114

USSG § 2B2.3, Trespass .........................................................116

USSG, § 2A2.4, Obstructing or Impeding Officers…………………..117

USSG, § 3C1.1, Obstructing or Impeding Officers…………………..117

## 18 U.S.C. § 1752(a)(1) and (2) and (c)

18 U.S.C. § 1752, in relevant part, provides:

(a) Whoever—

(1)    knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2)    knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

. . .  or attempts or conspires to do so, shall be punished . . . .

(c) In this section—

(1)  the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

    (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

    (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

    (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

(2)  the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

## 40 U.S.C § 5104

**(a)    Definitions.—In this section—**

(2) Dangerous weapon.—The term "dangerous weapon" includes—

(A) all articles enumerated in section 14(a) of the Act of July 8, 1932 (ch. 465, 47 Stat. 654); and

(B) a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a

stiletto, and a knife having a blade over three inches in length.

**(e) Capitol Grounds and Buildings Security.—**

1) **Firearms, dangerous weapons, explosives, or incendiary devices.—**An individual or group of individuals—

(A) except as authorized by regulations prescribed by the Capitol Police Board—

(i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, or an incendiary device, explosives, or an incendiary device;…..

**(2) Violent entry and disorderly conduct.--**An individual or group of individuals may not willfully and knowingly--

> **(A)**    enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

> **(B)**    enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

**(C)** with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of—

    **(i)** either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or

    **(ii)** the Library of Congress;

**(D)** utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;

**(E)** obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings;

**(F)** engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or

**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.

**(e)(3) Exemption of government officials**.—This subsection does not prohibit any act performed in the lawful discharge of official duties by—

(A) a Member of Congress;

(B) an employee of a Member of Congress;

(C) an officer or employee of Congress or a committee of Congress;

or

(D) an officer or employee of either House of Congress or a committee of that House.

## D.C. Code § 5–331.03. Policy on First Amendment assemblies.

It is the declared public policy of the District of Columbia that:

(1) Persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia, and to engage in First Amendment assembly near the object of their protest so they may be seen and heard, subject to reasonable restrictions designed to protect public safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies to use the streets, sidewalks, and other public ways to travel to their intended destinations, and use the parks for recreational purposes; and

(2) MPD shall not engage in mass arrests of groups that include First Amendment assemblies or that began as a First Amendment assembly unless MPD:

(A) Determines that the assembly has transformed, in substantial part or in whole, into an activity subject to dispersal or arrest; and

(B) Has issued an order to disperse as described in § 5-331.07(e) and (e-1).

## D.C. Code § 5–331.07. Police handling and response to First Amendment assemblies.

(a) The MPD's handling of, and response to, all First Amendment assemblies shall be designed and implemented to carry out the District policy on First Amendment assemblies established in § 5-331.03.

(b)(1) Where participants in a First Amendment assembly fail to comply with reasonable time, place, and manner restrictions, the MPD shall, to the extent reasonably possible, first seek to enforce the restrictions through voluntary compliance and then seek, as appropriate, to enforce the restrictions by issuing citations to, or by arresting, the specific non-compliant persons, where probable cause to issue a citation or to arrest is present.....

(e) If the MPD determines that a lawful First Amendment assembly, any other public assembly, riot, or part thereof, should be dispersed, the MPD shall:

(1) Where there:

(A) Is not an imminent danger of bodily injury or significant damage to property, issue at least 3 clearly audible and understandable orders to disperse using an amplification system or device, waiting at least 2 minutes between the issuance of each warning; or

(B) Is imminent danger of bodily injury or significant damage to property, issue at least one clearly audible and understandable order to disperse using an amplification system or device;

(2) Provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal; and

(3) Capture on body-worn camera each component of the order to disperse described in subsection (e-1) of this section.

(e-1) An order to disperse shall:

(1) Be authorized by an official at the rank of Lieutenant or above;

(2) Inform the persons to be dispersed of the law, regulation, or policy that they have violated that serves as the basis for the order to disperse:

(3) Warn the persons to be dispersed that they may be arrested if they do not obey the dispersal order or abandon their illegal activity; and

(4) Identify reasonable exit paths for participants to use to leave the area that will be dispersed.....

## Sentencing Guidelines

### USSG § 2B2.3, Trespass

**(a)** Base Offense Level: 4

**(b)** Specific Offense Characteristics
    **(1)** (Apply the greater) If--
        **(A)** the trespass occurred (i) at a secure government facility; (ii) at a nuclear energy facility; (iii) on a vessel or aircraft of the United States; (iv) in a secure area of an airport or a seaport; (v) at a residence; (vi) at Arlington National Cemetery or a cemetery under the control of the National Cemetery Administration; (vii) at any restricted building or grounds; or (viii) on a computer system used (I) to maintain or operate a critical infrastructure; or (II) by or for a government entity in furtherance of the administration of justice, national defense, or national security, increase by 2 levels; or
        **(B)** the trespass occurred at the White House or its grounds, or the Vice President's official residence or its grounds, increase by 4 levels.

    **(2)** If a dangerous weapon (including a firearm) was possessed, increase by 2 levels.

    **(3)** If (A) the offense involved invasion of a protected computer; and (B) the loss resulting from the invasion (i) exceeded $2,500 but did not exceed $6,500, increase by 1 level; or (ii) exceeded $6,500, increase by the number of levels from the table in § 2B 1.1 (Theft,

Property Destruction, and Fraud) corresponding to that amount.

**(c)** Cross Reference

  **(1)** If the offense was committed with the intent to commit a felony offense, apply § 2Xl .1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above.

## USSG, § 2A2.4, Obstructing or Impeding Officers

**(a)** Base Offense Level: 10

**(b)** Specific Offense Characteristics

  **(1)** If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels.

  **(2)** If the victim sustained bodily injury, increase by 2 levels.

**(c)** Cross Reference

  **(1)** If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault).

## USSG, § 3C1.1, Obstructing or Impeding Officers

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.